Liane **BRANDON**, Plaintiff,

v.

The **REGENTS OF the UNIVERSITY OF CALIFORNIA**, Defendant.

Civ. A. No. 76–580–C.

United States District Court,
D. Massachusetts.

Oct. 12, 1977.

Blair L. Perry of Hale & Dorr, Boston, Mass., for plaintiff.

Frank H. Handy, Jr., Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

This civil action, commenced under 15 U.S.C.A. § 1125(a) (1970), came before the Court for non-jury trial. Plaintiff, Liane Brandon, is a resident and citizen of the Commonwealth of Massachusetts. Defendant, the Regents of the University of California, is a corporation organized under the laws of California with its principal place of business in California. Defendant has been engaged in doing business in Massachusetts at all relevant times. Plaintiff seeks injunctive relief, an accounting and recovery of lost profits, compensatory damages, and costs for alleged unfair competition, false description, and false representation in connection with the distribution of a film by defendant through its Extension Media Center (EMC) in Berkeley, California. EMC is engaged in the business of selling and renting prints of some 3,000 motion picture films throughout the United States as well as in foreign countries. Plaintiff claims jurisdiction on the basis of a federal question, 28 U.S.C.A. § 1331 (1970), and diversity of citizenship, 28 U.S.C.A. § 1332 (1970), alleging in addition that the matter in controversy exceeds the sum of $10,000, exclusive of interest and costs.

Upon completion of the trial and pending the decision herein, this Court, on plaintiff's motion pursuant to Rule 65, Fed.R.Civ.P., entered a preliminary injunction enjoining defendant from exhibiting, selling, renting, leasing, distributing or transferring any prints of the disputed film, and from publishing or distributing any catalogue or similar advertising or promotional material referring to the film.

At the two-day non-jury trial, the parties called six witnesses and introduced into evidence fifty exhibits, including film prints, promotional material, film reviews, catalogues, correspondence, purchase orders, and EMC's records of the sales and rentals of the film in question. The Court viewed the films offered by both parties. Requested findings of fact and rulings of law have been submitted. Pursuant to Fed.R.Civ.P. 52(a), I find and rule as follows:

Plaintiff Liane Brandon is an Assistant Professor of Film Production and Media Studies at the University of Massachusetts in Amherst. She is an experienced filmmaker who has produced, directed and edited a number of short motion picture films that have been widely distributed throughout the United States and in foreign counties. In 1970–1971, plaintiff produced, directed and edited an eight-minute black-and-white motion picture film entitled "Anything You Want To Be" (plaintiff's film). Plaintiff's film is concerned with the general subject matter of sex-role stereotyping in contemporary American society. The film is aptly summarized in the following review published on March 5, 1973 by the defendant through its EMC:

Anything You Want To Be (New Day Films) by Liane Brandon . . . identifies the conventional self-images instilled in women as well as the stereotyped roles they are forced into. A high school girl is shown being continuously frustrated as she tries to make independent choices regarding her future. She wants to be class president, but ends up as secretary instead. She visits her guidance

counselor to discuss her desire to become a doctor, and comes out dressed in nurse's attire. Chemical instruments are mysteriously transformed into kitchen utensils as she tries to use them, and a book on political history she wants to read is surreptitiously replaced by a cookbook. At every step, the alternatives to the traditional female roles seem to disappear and the girl's aspirations are foiled. Despite the seriousness of its theme, this film's approach is light, even humorous, and it is particularly valuable for use with junior and senior high school audiences.

Plaintiff owns all rights in and to her film, subject only to distribution rights granted to three distributors. Public distribution of plaintiff's film, through the sale and rental of prints of the film, commenced in 1971 and has continued to the present time. From 1972 to date, plaintiff's film has been distributed by the sale and rental of prints by New Day Films, a cooperative distribution group of independent filmmakers. In addition, The Eccentric Circle, a commercial film distributor, distributed plaintiff's film by the sale of prints from 1972 to 1976. Marlin Motion Pictures Ltd., of Ontario, Canada, also distributed plaintiff's film by the sale and rental of prints from 1974 to date. From 1972 to date, New Day Films and The Eccentric Circle distributed catalogues, brochures, mailing circulars and other materials widely advertising and promoting plaintiff's film. Reviews of plaintiff's film have been published in a large number of books, magazines, professional journals, and newspapers. Moreover, plaintiff's film has been shown at a number of important film festivals and institutional exhibitions in the United States, receiving the high honor of a Blue Ribbon at the American Film Festival in 1972.

I find that plaintiff's film has received widespread critical acclaim which, coupled with the extensive advertising and promotional efforts by plaintiff and her distributors, has made the title of the film, "Anything You Want To Be," well-known as referring to and identifying plaintiff's film to persons who would purchase, rent, and exhibit films dealing with women's rights and sex-role stereotyping.

In response to a growing demand for films about women, EMC formed a special committee in the summer of 1972 to evaluate existing films. The committee screened approximately fifty films, recommending that EMC purchase a dozen of them, including plaintiff's film. In October, 1972, defendant submitted a purchase order to New Day Films for a print of plaintiff's film. Plaintiff, however, through her distributor, refused to authorize the sale of a print of her film to defendant for rental purposes, and so informed defendant in writing. On May 15, 1973, defendant wrote directly to the plaintiff, inquiring whether it could purchase a print of plaintiff's film, together with a print of another film, for rental use. On May 17, 1973, and on June 19, 1973, plaintiff wrote to defendant to reconfirm her prior refusal to sell prints of her film to defendant for rental purposes. In May, 1974, defendant attempted for the third time to purchase a print of plaintiff's film, this time by submitting a purchase order to The Eccentric Circle. That order was cancelled when defendant again was informed that a print of plaintiff's film would not be sold for rental distribution by the EMC.

In early 1974, the Director of EMC, Cameron Macauley, traveled to the Far West Laboratory for Educational Research and Development (Far West) to view three short films dealing with sex-role stereotyping produced by Far West employees Gloria Golden and Lisa Hunter. One of the Far West films screened was entitled, "Anything They Want To Be," a title substantially identical to the title of plaintiff's well-known film, "Anything You Want To Be." Far West copyrighted the film in 1974 and is still the copyright owner. Allegedly conceived by Golden, the Far West film, by comparison with plaintiff's film, was seven rather than eight minutes long, addressed the same issue of sex-role stereotyping in intellectual and career-oriented activities, and treated the experiences of several, rather than a single, high school

girls. Moreover, scenes in the Far West film are quite reflective of scenes or dialogue in plaintiff's film. Scenes in the Far West film, for example, question whether a girl can become a fireman, a chemist, or a doctor; the identical occupations are portrayed or mentioned in plaintiff's film.

Producers Golden and Hunter both testified as witnesses for the defendant at the trial of this action. Hunter admitted responsibility for the rental of a print of plaintiff's film to use in preparation of the Far West film. In testimony I find to be not credible, Hunter also stated that she had never viewed plaintiff's film before making the Far West film. When asked on cross-examination to explain the reasons for the similarities between the titles of the Golden-Hunter films produced at Far West and the titles of well-known films previously made by others,[1] including plaintiff, Golden offered no explanation, while Hunter gave an evasive response. Each of them testified that the title "Anything They Want To Be" was derived from a line of dialogue in their film, in which a teacher says to a little girl "Well, of course, Laura, anybody can be anything they want to be." However, that line of dialogue was not a spontaneous utterance of a real teacher filmed in an actual classroom. Rather, it was a line spoken by an actor using a script prepared under the direction of producers Golden and Hunter. After viewing both films and scrutinizing the testimony of Golden and Hunter, I find, first, that this line of dialogue was deliberately included in the script to serve as a foundation for the title, and not vice versa, and, second, that the line was adapted in substance from the opening lines of dialogue in plaintiff's film: "When I was a little girl . . . my parents told me, you can be anything you want to be." Accordingly, I find that in August of 1973 producers Golden and Hunter, in a brazen act of outright plagiarism, deliberately selected the title "Anything They Want To Be" for the Far West film in order to trade upon the reputation and goodwill of plaintiff's similarly-titled film.

There is no direct evidence that Macauley or anyone else at the EMC suggested the use of the title "Anything They Want To Be" to Golden or Hunter during production. It is clear, however, that Macauley was made aware of the title and contents of the film in early 1974 at the Far West screening, if not before. Therefore, I find that the title of the Far West film was known to Macauley in May, 1974, when he agreed to enter into a Distribution Agreement with Far West providing that the defendant would underwrite the remaining production costs of the film (including the cost of the internegatives from which prints would be made for sale and rental by the EMC) in exchange for exclusive distribution rights. At the same time, Macauley was well aware of plaintiff's film and its widespread recognition, and his testimony to the contrary, particularly in light of the prior EMC purchase orders, simply is not credible.

Although the formal production-distribution agreement between defendant and Far West was not executed until August 28, 1975, the Far West film was delivered to defendant by October, 1974. Defendant then commenced distribution of the film,[2] advising the public of its availability through a press release and a subject matter description published in the EMC bulletin *Lifelong Learning*, in its film catalogue, and in its advertising brochures. Defendant refused to stop distribution of the film under the title "Anything They Want To Be" despite at least one written demand to

---

1. There was also credible evidence that Golden and Hunter had produced a film with the title "Hey! What About Us?", identical in wording to the title of the well-known film "Hey, What About Us!" directed by Joyce Chopra and edited by Werner Bundschuh, which had been released in 1968 and shown on national educational television. In addition, Golden and Hunter had produced a film with the title "Women Emerging," a title remarkably similar to the title of "The Emerging Woman," a well-known film about women's rights.

2. EMC sold prints of the Far West film for $110 and rented them for $15; plaintiff's distributors offered her film at a sales price of $95 and a rental price of $12.

that effect made by plaintiff on September 11, 1975.

I find that sales and rentals of plaintiff's film increased each year from 1971 to 1974. In that year, plaintiff realized gross income of approximately $12,000 from sales and rentals of her film, and net income of approximately $6,000 after deduction of all distribution costs. As noted above, defendant commenced distribution of the Far West film in October, 1974. In 1975, plaintiff's gross film income decreased to approximately $11,000 and her net income decreased to approximately $5,500. In 1976, her gross film income decreased to approximately $6,000 and her net income decreased to approximately $1,700. Meanwhile, defendant's records show that defendant's distribution of the Far West film earned as follows:

| Year | Sales Number | Sales Amount | Rentals Number | Rentals Amount |
|------|------|------|------|------|
| 1974 | 2 | $ 190.00 | 11 | $ 132.00 |
| 1975 | 35 | 3,135.25 | 201 | 2,412.00 |
| 1976 | 46 | 4,488.75 | 92 | 1,104.00 |
| 1977 (Jan.–Apr.) | 16 | 1,401.25 | — | —— |
| | 99 | $9,215.25 | 304 | $3,648.00 |

I find that the rentals, sales, and income from plaintiff's film diminished substantially once defendant commenced distribution of the Far West film in 1974. This pattern of rising plaintiff income followed by EMC distribution followed by falling plaintiff income cannot be explained on the evidence presented at trial as merely reflecting the competitive entry of a new but similar product into the marketplace. Rather, I find that this decrease of plaintiff's profits was the direct result of defendant's production and distribution of a film nearly identical to plaintiff's.

Prior to the time when defendant began distribution of the Far West film, plaintiff was realizing net income of approximately $6,000 per year from her film. I further find that such income reasonably could be expected to continue at that level for at least several more years, especially in view of increasing public interest in women's rights and sex-role stereotyping.

In an accounting, the relevant sum is defendant's net income from the sales and rentals of the Far West film. Defendant has conceded that the burden is upon it to prove any expenses to be charged against its gross income of $12,863.25. Defendant offered no evidence at trial of any such expenses. I rule, therefore, that more than the minimum jurisdictional amount is present because, even without regard to plaintiff's lost income, damages granted pursuant to an accounting can exceed $10,-000.

The significance of the facts as found above is to be determined on the basis of the claims leveled by plaintiff against defendant and the defenses interposed thereto. Plaintiff has *not* alleged any violation of federal copyright law but has charged defendant with: (1) the deliberate, intentional copying of the title, subject matter and theme of plaintiff's film in order to trade upon its excellent reputation; (2) unfair competition; and (3) false description and representation by defendant's use of the title of plaintiff's film in interstate commerce. Defendant has denied each of these allegations and raised in a conclusory fashion the following seven defenses: (1) lack of the requisite amount in controversy for § 1332 jurisdiction; (2) failure to state a cause of action for which relief can be granted; (3) neglect to inform defendant of plaintiff's claim of unfair competition; (4) waiver of the alleged cause of action; (5) no infringement of plaintiff's copyright; (6) no infringement of plaintiff's copyright by defendant; and (7) failure to prove a violation of 15 U.S.C.A. § 1125(a).

I rule that, absent an allegation of copyright infringement, defenses numbered 5 and 6 are frivolous and of no materiality to this case. I further rule that the finding above as to earnings effectively disposes of defendant's first claimed defense. I further rule that the letter referred to above dated September 11, 1975, notifying defendant that plaintiff claimed unfair competition, effectively disposes of defendant's

third and fourth defenses. I rule that the three allegations in plaintiff's complaint set out immediately above effectively dispose of defendant's second defense and that all the evidence described in this Opinion effectively disproves defendant's claim that plaintiff has not proved a violation of 15 U.S.C.A. § 1125(a). In ruling that plaintiff has proved a case under 15 U.S.C.A. § 1125(a), I have in mind that the offending Far West film clearly constitutes "goods" and admittedly has traveled in interstate commerce. Although the title of a copyrighted work is not absolutely protected against use by others, *Warner Bros. Pictures v. Majestic Pictures Corp.*, 70 F.2d 310, 312 (2d Cir. 1934), a film title, nevertheless, is entitled to judicial protection under the common law doctrine of unfair competition (as codified in Section 1125(a)) when it has attained a "secondary meaning," *i. e.*, when it is associated in the minds of a substantial number of people with the goodwill that that particular film has achieved through public distribution and advertising. *Warner Bros. Pictures v. Majestic Pictures Corp., supra ; National Picture Theatres, Inc. v. Foundation Film Corp.*, 266 F. 208, 210–11 (2d Cir. 1920). I find and rule that the plaintiff's widely- and well-known film had acquired the requisite "secondary meaning" in at least the eyes of the film-consuming public.

I further rule that the existence of this secondary meaning for the title and the greatly confusing similarity between the two films amply establish that defendant's conduct in distributing the Far West film with a plagiaristic title supports branding defendant's conduct as the use of a "false description or representation" in connection with goods placed in interstate commerce. I rule that the findings of a decrease in plaintiff's income from her film concurrent with the increase in defendant's income from the Far West film proves the actual damages caused by defendant's use of the misleading title. It should be noted that it is sufficient to establish a violation of Section 1125(a) to show that the title used created a false impression. *John Wright,*

*Inc. v. Casper Corp.*, 419 F.Supp. 292, 325 (E.D.Pa.1976).

I am persuaded that plaintiff has proved each of the essential elements of a cause of action under 15 U.S.C.A. § 1125(a) and that EMC's distribution of the Far West film under the title "Anything They Want To Be" constituted and constitutes unfair competition, entitling plaintiff to all relief available under Section 1125(a). Because of the abundant evidence of defendant's three unsuccessful attempts to purchase prints of plaintiff's film for EMC rental and because of Macauley's prior knowledge, I find that defendant acted deliberately with an awareness of the similarity of titles, subject matter, theme, presentation, running time, and price range of both films before it entered into the Distribution Agreement. Because of this deliberate pirating of plaintiff's property, I rule that plaintiff is entitled to injunctive relief, damages and an accounting, and the preliminary injunction previously entered herein shall now issue as a permanent injunction enjoining defendants from any further distribution of the film "Anything They Want To Be" under that title or any other title similar to "Anything You Want To Be." Defendant will be directed to give notice in all its catalogues or in response to any inquiries for the film "Anything They Want To Be" that the film is no longer available from EMC and that plaintiff's film is available from New Day Films.

The Order will also provide that plaintiff is entitled to an accounting of all of defendant's gross income from the sale and rental of the Far West film and that plaintiff is also entitled to recover reasonable attorneys' fees and costs.