**The HOSPITAL FOR SICK CHILDREN, Great Ormond Street, London, and Samuel French, Inc., Plaintiffs,**

**v.**

**MELODY FARE DINNER THEATRE, et al., Defendants.**

Civ. A. No. 79–975–A.

United States District Court, E. D. Virginia, Alexandria Division.

June 12, 1980.

T. Farrell Egge, Alexandria, Va., David Blasband, Linden & Deutsch, New York City, for plaintiffs.

Raymond B. Benzinger, Arlington, Va., for Ardith Cavallo and Melody Fare Dinner Theatre.

La Rue Van Meter, Falls Church, Va., for Lawrence Cavallo.

## MEMORANDUM OPINION

ALBERT V. BRYAN, Jr., District Judge.

This action is brought by the alleged owners of a copyright to a play or dramatic

composition entitled "Peter Pan or. The Boy Who Would Not Grow Up." The plaintiffs assert copyright infringement (Count I) and violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count II) on the part of the defendants for their producing and presenting a musical play entitled "Peter Pan— The Magical Musical"[1] and advertisements in connection with that production. Also included are counts alleging unfair competition under 15 U.S.C. § 1126 (Count III) and under the laws of Virginia (Count IV), although these last two counts were not pressed at trial.

Jurisdiction is based on 28 U.S.C. § 1338(a). The case was tried to the court on June 2, 1980; and judgment was reserved to enable the court to read and compare the publications involved. This has now been accomplished.

### Ownership

As a first issue, the defendants contend that there is not only insufficient proof that the plaintiffs own the copyrighted work, but that the evidence shows that the ownership of the work is vested in one Charles Frohman (Frohman), for whom James Matthew Barrie (Barrie), the plaintiff's predecessor, was to write the work under a commission for hire.

The court will discuss the latter contention first. The evidence to support this contention is as follows: First, a statement on the back of a record jacket (Def. Ex. 1) for a recording of "Jean Arthur and Boris Karloff in J. M. Barrie's Peter Pan," with song and lyrics by Leonard Bernstein; and second, a passage in "Charles Frohman: Manager and Man" (Def. Ex. 3, pp. 168–169), which is quoted in "J. M. Barrie and the Lost Boys" (Def. Ex. 4, pp. 104–105), and a passage in "Barrie: The Story of a Genius" (Def. Ex. 5, p. 355).[2] These items of evidence refer to the work as having been written by Barrie on commission from Frohman. Opposed to these are the voluminous credits over the years attributing the work to Barrie without reference to Frohman, including the defendants' exhibit 6 at pp. viii–ix, and culminating in the copyright grant in 1928. It is true that the copyright was obtained after Frohman's death, albeit thirteen years—hardly an indecent interval—after that event. The court, however, has an insufficient basis, at this late date, to ascribe, as suggested by counsel, any theft of Frohman's work or other perfidy to Barrie. Apparently, it has not occurred to any successor to Frohman to challenge Barrie's claim to rights in the work. The court is satisfied that ownership of the work is legitimately vested in Barrie and his successors.

The question of the chain of title to Barrie's interest in the work centered around the authenticity of foreign documents, namely, the document vesting assent of the executors of Barrie's estate (Pltf. Ex. 25), the will of Barrie (Pltf. Ex. 27) and the assignment to The Hospital for Sick Children (Pltf. Ex. 26). The court admitted into evidence all of these documents over the objection of defendants. No serious basis for believing the documents are not what they purport to be has been advanced; and despite defendants' assertions to the contrary, the court is persuaded that a reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of the documents and therefore that they should be admitted. F.R.Civ.P. 44(a)(2).

Certain facts are pertinent to the ownership of the copyright in question and they are these:

1. The play "Peter Pan" was written in 1904 by Barrie, was first produced in Eng-

---

1. In the flyers, brochures and advertisements for the production, the words "Peter Pan" are featured, and the words "—The Magical Musical" or "Magnificent Magical Musical" are in substantially smaller print or added as a subheading (Pltf. Exs. 6(b); 6(c); 7; 11; 12(a)–12(d)).

2. The defendants have designated as exhibits only certain pages of these books; and the Court has not undertaken to read the entire text of any of these exhibits.

land in 1905, and was first published[3] in the United States in 1928.

2. In 1928, the United States Copyright Office issued certificate of copyright registration D 85173 for the play "Peter Pan or The Boy Who Would Not Grow Up" in the name of James Matthew Barrie.

3. By instrument dated August 14, 1929, Barrie assigned to The Hospital for Sick Children the copyright for the play "Peter Pan."

4. Barrie died in 1937.

5. In his last will and testament, proved on September 15, 1937, Barrie bequeathed all of his copyright interest in and to the play "Peter Pan," among other literary properties, to The Hospital for Sick Children. By his will, Barrie named as his executors and trustees Peter Llewelyn Davies and Lady Cynthia Asquith.

6. By instrument dated January 20, 1942, Peter Llewelyn Davies and Lady Cynthia Asquith, as executors of the last will and testament of Barrie, assented to the vesting in The Hospital for Sick Children of all rights to the copyright of the play "Peter Pan" as well as other literary properties referred to in the assignment dated August 14, 1929.

7. The reference to "Peter Pan" in the above documents and elsewhere is a reference to "Peter Pan or The Boy Who Would Not Grow Up." The court is not persuaded that the omission of the words "or The Boy Who Would Not Grow Up" or the various forms of the title listed in the Catalog of Plays of Samuel French (Def. Ex. 15) warrants a contrary finding.

8. The United States Copyright Office issued a certificate of registration to renewal copyright for the play "Peter Pan or The Boy Who Would Not Grow Up," No. R 171R21, in the names of Peter Llewelyn Davies, Lady Cynthia Asquith and Barclay's Bank Ltd., as executors of Barrie.

9. The play "Peter Pan or The Boy Who Would Not Grow Up" consists of material wholly original with Barrie, and constitutes copyrightable subject matter under the laws of the United States.

From the foregoing the court concludes that The Hospital for Sick Children is the owner of all rights and interest in the copyright of the play "Peter Pan or The Boy Who Would Not Grow Up." It further finds that plaintiff Samuel French, Inc., is the owner of the exclusive right to license the play in the United States.

### What Was Copyrighted?

During the presentation of the defendants' evidence it was revealed that the copy or copies of the copyrighted work which were deposited in the Copyright Office in 1928 could not be found by that office (Def. Ex. 20). Accordingly the court has to resolve the factual issue whether plaintiffs' exhibit 3 entitled "Peter Pan, a Fantasy in Five Acts" by J. M. Barrie, is the same as the copy which was originally filed with the Copyright Office.[4] The court finds that it is. While of course the legend

---

**3.** The word "published" as used here means the publication as referred to in Section 10 of the Copyright Act of 1909, and the securing of the statutory copyright. The work was apparently shown in the United States well prior to 1928; and the plaintiffs rely on their common law right of representation prior to that time. *Ferris v. Frohman*, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492 (1912). (Interestingly, the respondent in that case is apparently our same Charles Frohman.)

**4.** Apparently this issue was raised by the defendants for the first time at the commencement of trial, a factor which casts some doubt on the credibility of this as a defense. During the trial, the defendants attempted to elicit testimony as to the contents of a book, and to introduce the book itself, which bore the title "Peter Pan, or The Boy Who Would Not Grow Up." The court initially sustained plaintiff's objection to the book as an exhibit because it had not been listed as an exhibit at the pretrial conference in accordance with the pretrial order of January 29, 1980. When it became apparent that there was no copy of the work which could be located in the Copyright Office, the court advised counsel that it would receive the book in evidence; and counsel for the plaintiffs withdrew his objection to it as an exhibit. However, in response to the statement by the court that it would receive the book in evidence if offered, both parties expressly declined to offer it as an exhibit.

and notice appearing at page 2 of the publication is not conclusive, it is entitled to some weight. Moreover the testimony convinces the court that the contents of exhibit 3 constitute the only work which has been licensed in the United States for the over 1500 productions and 8500 performances of the play "Peter Pan" presented since 1928; and is the only publication of what was copyrighted of which any party has any knowledge. Apparently there has been no question concerning this until now.

## Infringement

■ In determining the merits of the case the court's first task is that of comparison of the works involved, which are plaintiffs' exhibit 3 and the play of the defendants, "Peter Pan—The Magical Musical" (Pltf. Ex. 1).

There are slight differences and variations, but the cast of characters in both includes Peter Pan, Michael, Mr. and Mrs. Darling, John, Wendy, Tinker Bell (Tinkerbell in defendants' work), Slightly Soiled [Slightly (Damp) in defendants' work], Nibs (Nip in defendants' work), Captain Hook, and Smee (Shmee in defendants' work). Each work begins with Mrs. Darling putting her children to bed at night. The theme and plot of both includes the following elements: Peter Pan, the boy who flies, appears at the window after Mrs. Darling has left; his shadow is a detachable thing; his saying he will never grow up; Never Land; the lagoon; the crocodile who had swallowed the clock and who had eaten the hand of Captain Hook, the pirate; the lost boys; fairies and mermaids; the fairy Tinker Bell; Wendy as the pretend mother; sewing on Peter's shadow; Captain Hook's desire for revenge against Peter Pan for causing the loss of his hand to the crocodile; the pirates poisoning the medicine (a cake in defendants' work) which Tinker Bell drinks (eats); the kidnapping of the children by the pirates; the fight between Peter Pan and Captain Hook; the rescue of the children; and the return of the children to the nursery where the story began. More specific similarities have been cataloged by the plaintiffs; that catalog is attached as part of the court's findings of fact.

The plaintiffs of course must prove that its work was copied. One need do no more than read the two works to find striking and substantial similarities.[5] The work of the defendants is manifestly a "piratical composition," *Ferris v. Frohman, supra*, p. 437, 32 S.Ct. p. 267, as to plot, theme, setting and characters.

If defendants' access to the copyrighted work need be shown, it can hardly be denied in the face of the wide dissemination of plaintiffs' work. The play "Peter Pan" has acquired considerable fame and popularity as a result of many performances on stage and in motion pictures and television over a period of 75 years in the United States and throughout the world. In the last eleven years, Samuel French has licensed some 700 separate productions of the play throughout the United States. In addition, it has licensed over 400 productions of the musical version of "Peter Pan" in that period. Between 1968 and 1979, stock and amateur performances of the musical version of "Peter Pan" have grossed over $3 million. Famous Broadway performances of "Peter Pan" have been presented, including the production starring Mary Martin, and the current production starring Sandy Duncan. Prior to opening on Broadway, the Sandy Duncan production played in Dallas, Washington, D. C., and Atlanta in 1979, where it grossed over $900,000. The National Broadcasting Company presented the play on television starring Mary Martin in 1955, 1956, 1960, 1963, 1966 and 1973. Many thousands of copies of the play have been sold by Samuel French, Inc. Moreover the defendant Ardith Cavallo testified as to her access to two and perhaps three recordings of other arrangements of the musical play "Peter Pan."

5. Once the works are read it is clear why the defendants spent so much of their case contesting ownership and what was copyrighted. The plaintiffs' evidence on the merits is overwhelming.

The court concludes that the defendants' work is a copy of the plaintiffs' work entitled "Peter Pan or The Boy Who Would Not Grow Up," as copyrighted since 1928.

### Infringing Activities of Defendants

In March, April, May and June, 1979, defendants Melody Fare Dinner Theatre, Real Corporation[6] and Lawrence Cavallo presented "Peter Pan—The Magical Musical," authored by defendant Ardith Cavallo, at the Melody Fare Dinner Theatre, before paying audiences. No license was sought or acquired by any defendant from either plaintiff with respect to the production of the play at the Melody Fare Dinner Theatre.

### Defenses

■ The defendants argue that Peter Pan is merely an amalgam of characters from earlier works of Barrie, principally The Little White Bird; that these characters were in the public domain; and that therefore there is no copyrightable material to sustain the validity of the 1928 copyright. First, while characters alone may not be copyrightable, *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945 (9th Cir. 1954), *cert. denied* 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756, the "amalgamation" of the characters into the theme of "Peter Pan" was done by Barrie. Second, The Little White Bird, while containing a Peter Pan, contains no Tinker Bell, Captain Hook (or other character who is a pirate), Mr. or Mrs. Darling, Michael, John, Wendy or Never Land. Insofar as the works "Peter and Wendy" and the "Boy Castaways of Black Island" are concerned, not enough is revealed in this record of the contents of those books to make any comparison. There is no suggestion that the theme or cast of characters in either work is the same as the theme or characters of "Peter Pan," although there may be some characters in "Peter Pan" who appear in the other works.

The defendants argue that their play is a libretto as distinguished from a narrative such as plaintiffs' exhibit 3. This distinction makes no difference. The defendants' work remains a material and substantial tracking of the pattern of plaintiffs' play.

### Damages

■ There is no evidence that the plaintiffs suffered any monetary damage; and the testimony concerning the defendants' profits is uncertain. While gross profits were approximately $38,000 for some 50 performances, this figure includes receipts for both dinner and the show, sold for a combination price of from $5.50 to $10.50. Of the $10.50 package ticket, $5.00 was allocated to the show; for a $5.50 ticket, $2.50 was allocated to the show. How many patrons at each price or the amount of overhead expenses incurred is not revealed by the evidence.[7] In any event the plaintiffs elected, prior to judgment, pursuant to 17 U.S.C. § 504(c), to recover an award of statutory damages. The court concludes that as basic statutory damages the sum of $2,500 is justified. This amounts to $50.00 per performance; and will be assessed against all the defendants jointly and severally.

In addition the court finds that the infringement was committed wilfully on the part of the defendant Ardith Cavallo. She is the person who wrote the accused work and directed its performance. She applied for its copyright; and it is apparent to the court she was the guiding hand in the activities of the defendants insofar as the play was concerned. The court is not persuaded by the assertions of Ardith Cavallo that she felt she was entitled to publish this without license because of the "public domain" character of the theme. Her research which revealed the facts on which she relies for this characterization was conducted after she was sued—here and in Richmond. Her

---

6. Real Corporation has since gone into bankruptcy and a suggestion to that effect has been filed.

7. Under 17 U.S.C. § 504(b), proof of gross revenue is sufficient; however, here it is not clear what gross revenues *from the show* were received.

attribution to "Peter Pan and Wendy" (sic) as the basis of her work in her March 2, 1979 application to the Copyright Office (Pltf. Ex. 8), while perhaps technically absolving her of plagiarism, does not excuse her copying. Licenses apparently had been obtained for prior productions at the Melody Fare Dinner Theatre, including "Oliver" and "Pal Joey." The damage award against Ardith Cavallo will be increased to $10,000. 17 U.S.C. § 504(c)(2).

### Lanham Act

■ While individual characters may not be copyrightable, *Warner Bros. Pictures, Inc. v. Columbia Broadcasting Systems, Inc., supra,* the title of a work may constitute a description or designation of origin within the meaning of § 43(a) of the Lanham Act. *Brandon v. Regents of University of California,* 441 F.Supp. 1086 (D.Mass. 1977). The words "Peter Pan" have come to be associated in the mind of the consuming public with the good will that Barrie's works have achieved through public distribution and advertising. *Brandon, supra* at 1091.

The defendants are attempting to pass off the work "Peter Pan" as their own; and it is not. The use of the words "Peter Pan" in the title of the defendants' work, and in their advertisements,[8] is very likely to create confusion, if not actually shown to have deceived any particular person. Some of the advertising materials include the phrase "based on" in reference to Barrie's work (Pltf. Ex. 6(b), 6(c)) or otherwise indicate that this work is a different version of the original work (Pltf. Ex. 11); other of defendants advertisements (Pltf. Ex. 7, 12(a)–12(d)), in particular those appearing in the *Washington Post,* do not refer to Barrie in any manner.

The use of words such as "based on" or "derived from" may be sufficient to negate any false designation or description that may otherwise be present. *See e. g., Geisel v. Poynter Products, Inc.,* 295 F.Supp. 331, 353 (S.D.N.Y.1968). Defendants' failure however consistently to use such disclaimers

and language of attribution warrants finding a Lanham Act violation.

There is no additional relief in the form of damages that the court may grant under the Lanham Act that is not already available to the parties for the copyright violations. The Lanham Act violation does however warrant injunctive relief.

### Relief

In addition to damages, plaintiffs are entitled to injunctive relief, and an award of attorneys' fees. 17 U.S.C. § 505. The defendants against whom the relief is awarded are Melody Fare Dinner Theatre; Lawrence Cavallo who is the president of and owns all the stock in Real Corporation, which owned and operated the Melody Fare Dinner Theatre; and Ardith Cavallo.