**BOOTHROYD DEWHURST, INC., Plaintiff,**

v.

**Corrado POLI, Defendant.**

**Civ. A. No. 89–1650–F.**

United States District Court, D. Massachusetts.

June 12, 1991.

John L. Welch, Wolf, Greenfield & Sacks, P.C., Boston, Mass., for plaintiff.

John J. Dempsey, Chapin, Neal & Dempsey, P.C., Springfield, Mass., John C. Linderman, McCormick, Paulding & Huber, Hartford, Conn., for defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I. INTRODUCTION

Plaintiff Boothroyd Dewhurst, Inc. ("BDI"), a Rhode Island corporation which is the successor to a Massachusetts corporation, Boothroyd & Dewhurst, Inc. ("B & D, Inc."), brings suit against Professor Corrado Poli ("Poli"), charging in a four-count complaint that Poli's activities have violated the Copyright Act, 17 U.S.C. §§ 101 *et seq.* (count one), section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (count two), the Massachusetts Consumer Protection Act, Mass.Gen.Laws ch. 93A ("chapter 93A") (count three) and constitute unfair competition under the common law of Massachusetts (count four). Defendant has filed counterclaims, alleging that plaintiff—through the actions of its principals, Professor Geoffrey Boothroyd ("Boothroyd") and Professor Peter Dewhurst ("Dewhurst")—has unfairly competed in trade in violation of chapter 93A, §§ 2 and 11 (count one) and Massachusetts common law (count two).

The parties filed cross motions for summary judgment on the claims against them.[1] Pursuant to 28 U.S.C.

---

1. Because of the possibility that this case might be disposed of on procedural grounds, the parties agreed to postpone consideration of substantive questions of copyright infringement. Further discovery relevant to these issues was also postponed. Accordingly, it remains to be decided whether any copyright infringement has in fact occurred.

The Court therefore takes issue with a statement in Plaintiff's Response to Defendant Poli's Objections to the Magistrate's Report and Recommendations at 12 n. * (Feb. 7, 1991). Plaintiff states that, according to the Magistrate, "the clear evidence of record supports a finding that POLI's spreadsheet was an infringement." *Id.,* *citing* Magistrate Judge's Report at 24. The Magistrate Judge recognized that such a finding would be premature. His Report states that there is "clear evidence of record that, *if accepted,* would support a finding of infringement...." Magistrate Judge's Report at 24 (emphasis supplied). In other words, it would not be possible, on the current record, to grant summary judgment for defendant on the issue of copyright infringement because plaintiff has produced enough to make the issue one for the trier of fact. However, plaintiff has not yet proved its case of infringement, and new evidence relevant to the issue may emerge during discovery.

§ 636(b)(1)(B), the matter was referred to Magistrate Judge Michael Ponsor for report and recommendation (resulting in the "Magistrate Judge's Report" or "the Report"). The Magistrate Judge recommended denying defendant's motion for summary judgment on plaintiff's copyright and state law claims; however, he recommended granting summary judgment for defendant on plaintiff's Lanham Act claim. With respect to defendant's counterclaims, the Magistrate Judge recommended granting plaintiff the summary judgment that it seeks.

Both parties have objected to certain portions of the Magistrate Judge's Report. Defendant objects to two specific statements in the Report's fact section and he reiterates to this Court his argument that plaintiff's copyright infringement claim is barred by laches and estoppel. Defendant also objects to the recommendation that plaintiff be granted summary judgment on defendant's chapter 93A counterclaim. In turn, plaintiff objects to the recommendation that defendant be granted summary judgment on plaintiff's Lanham Act claim. The Court will review these issues *de novo.* 28 U.S.C. § 636(b)(1). Those portions of the Report to which neither party has specifically objected will be adopted without further discussion.

## II. FACTUAL BACKGROUND

The Magistrate Judge's Report relates in detail the facts relevant to this suit and, with the exception of two specific objections by defendant, the parties have accepted his summary as accurate. For purposes of this Memorandum and Order, the Court will describe briefly the factual background of this dispute, reiterating in more detail those facts central to the parties' objections. Additional facts, not immediately pertinent to the issues before this Court, may be found in the Magistrate Judge's Report.

### A. Background Facts

This case arises from a longstanding dispute between the parties concerning Poli's alleged misuse of Boothroyd and Dewhurst's intellectual property. Poli and Dewhurst were originally colleagues and collaborators in research in the University of Massachusetts at Amherst's Department of Mechanical Engineering. From 1973 to 1982, they collaborated on research in the engineering field of Design for Manufacturability and, at least through 1978, in a sub-specialty, Design for Assembly ("DFA"). Magistrate Judge's Report at 5–6, *citing* Plaintiff's L.R. 18 [2] at ¶ 2; Defendant's Opp.L.R. at ¶ 2; Transcript of Hearing on Cross–Motions for Summary Judgment at 12 (Sept. 7, 1990) ("T.R.").

From 1978 through 1981, Boothroyd served as investigator and Poli as co-principal investigator on a National Science Foundation ("NSF") funded "Design for Manufacturability" research program which included a DFA component. The parties dispute the extent of Poli's contribution to DFA-related research under the grant, *see infra* at page 676, but they do not dispute that there were two tangible products of the research program: a handbook entitled "Design for Assembly" ("NSF Handbook") and a software program ("NSF Software"). Neither of these was protected by copyright. Magistrate Judge's Report at 6–7.

Dewhurst arrived at the University of Massachusetts as a visiting professor in 1980 and began collaborating with Boothroyd on various DFA-related projects. *Id.* at 7.

---

**2.** Because these are cross motions for summary judgment, each party has submitted a Local Rule 18 statement of undisputed facts in support of its, or his, motion for summary judgment. In addition, in opposition to their opponent's motion for summary judgment, both parties have submitted Local Rule 18 statements of disputed facts. As the Magistrate Judge did, the Court will refer to these documents as plaintiff's L.R. 18 (attached to Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims (June 29, 1990)) and Opp.L.R. 18 (attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Aug. 16, 1990)), and defendant's L.R. 18 (attached to Defendant's Motion for Summary Judgment (July 2, 1990)) and Opp. L.R. 18 (attached to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment Respecting Defendant's Counterclaims (Aug. 2, 1990)).

Subsequent to 1981, NSF declined to provide any additional funding for DFA research. However, Boothroyd and Dewhurst continued to collaborate in the field, spending 1981 through 1982 on the development of a microcomputer version of a software program, titled "Design for Assembly Software Tool Kit," ("DFA Software") intended to assist industrial designers in evaluating the difficulty of assembling their products. *Id.* Although defendant suggests that at least some of this work was done while Professor Boothroyd was still expending NSF funds, *see* Defendant Poli's Objections to the Magistrate's Report and Recommendation at 3–4 (Jan. 28, 1991), *citing* Boothroyd Deposition at 241–48 (attached to Defendant's Motion for Summary Judgment (July 2, 1990)), defendant does not dispute that this software program contained original copyrightable material in addition to material from the NSF Software. Boothroyd and Dewhurst also published a handbook, "Design for Assembly," incorporating material from the NSF Handbook but also containing original material.

In December 1983, to exploit burgeoning industry interest in their research and its tangible products, Boothroyd and Dewhurst incorporated B & D, Inc. to market their DFA Software and related items. Magistrate Judge's Report at 8. The copyrights in Boothroyd and Dewhurst's various DFA-related projects were assigned to the corporation. *Id.* Subsequently, in 1985, Boothroyd and Dewhurst left the University of Massachusetts and joined the faculty at the University of Rhode Island. They dissolved B & D, Inc. and incorporated BDI, plaintiff in this case, in Rhode Island. B & D Inc.'s copyrights were assigned to BDI. *Id.* at 8; 26–29.

### B. Poli's Spreadsheet and Plaintiff's Allegations of Infringement

The Magistrate Judge has provided the following thorough account of the facts underpinning plaintiff's allegation of copyright infringement and Boothroyd and Dewhurst's response to defendant's allegedly infringing activities.

By 1983 Poli had become a consultant for Digital Equipment Corporation ("DEC"). Boothroyd avers that he and Dewhurst "allowed" Poli to use their copyrighted DFA Software, which was apparently being used by DEC with Boothroyd and Dewhurst's permission. Boothroyd [Declaration (Aug. 16, 1990) ("Boothroyd Decl.")] at ¶ 11. He asserts that, without their knowledge or approval, Poli then created and distributed a so-called spreadsheet derived *directly* from Boothroyd and Dewhurst's DFA Software, thereby infringing on BDI's copyright. Specifically, plaintiff alleges that Poli copied the questions on the top of the spreadsheet from those which appear on the screen displays of BDI's Software. Poli also used the novel "partial silhouettes" that Boothroyd and Dewhurst had created to function along with the questions to allow programmers to make the design calculations more quickly. *Id.* at ¶¶ 8 and 11.

Adding insult to injury, at least from plaintiff's point of view, Poli copyrighted this derivative work and affixed a 1983 copyright notice to the spreadsheet naming himself as author and copyright owner. *Id.* at [¶] 11; Plaintiff's Exhibit 14 (copy of Poli's registration form No. TX 1–493–573) [attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Aug. 16, 1990)]. Dated October 30, 1984, this copyright registration not only lists Poli as the author of the entire spreadsheet but also fails to indicate the existence of any pre-existing materials upon which his work was based. *Id.*

Plaintiff also asserts that defendant admits that he "adapted" the questions directly from the DFA Software. Plaintiff's L.R. 18 at ¶ 4. The one-page deposition excerpt cited by plaintiff indicates that defendant concedes that he copied the questions "verbatim" from software he identifies as being produced "during the [1977–1982] NSF grant." Plaintiff's

Exhibit 8 (Poli [Deposition at I:95 [3]) attached to Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims (June 29, 1990)].

For his part, Poli does not dispute that he prepared the 1983 spreadsheet to be used in conjunction with Boothroyd and Dewhurst's copyrighted DFA software. Defendant's L.R. 18 at ¶ 17. However, he insists that his spreadsheet was "adapted, not derived" from software "developed in part under [the] NSF grant." Defendant's Opp.L.R. 18 at ¶ 4, citing Poli [Deposition at I:92–96].

. . . .

In 1984 B & D, Inc. learned that Poli had also prepared a software package for DEC entitled "Electronic Spreadsheet," believed by plaintiff to be based upon both the derivative 1983 Poli spreadsheet as well as plaintiff's copyrighted DFA Software and Handbook. The title page of the electronic spreadsheet actually lists Poli as one of three co-authors and indicates that DEC owns the 1984 copyright. *See* Plaintiff's Exhibit 16 [attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment)]. Through its attorney, William E. Hart ("Hart"), plaintiff's predecessor immediately complained to Poli. *See* [Plaintiff's Exhibit 15, attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Hart Letter to Poli of 10/19/84)].

This letter was forwarded to Poli's attorney, John J. Dempsey ("Dempsey"), who replied on November 1, 1984 that Poli "has absolutely no intention of infringing ..." and that any similarities resulted from Poli's "bona fide attempt to provide a graphic aid for the user of [B & D, Inc.] software." Defendant's Exhibit 4 [attached to Defendant's Motion for Summary Judgment (July 2, 1990)]. Moreover, Dempsey informed Hart that DEC owned the copyright for the accused software and that in order to avoid any further disputes regarding the spreadsheet, Poli had decided, "effective immediately, to abort any further distribution or use of this spreadsheet." *Id.*

According to plaintiff, Boothroyd and Dewhurst relied on Dempsey's assurances until they learned that Poli had produced a new, revised spreadsheet late in 1984, "Assembly Analysis and Linebalancing Spreadsheet" ... and an associated software version, both of which Poli considered to be non-infringing. Defendant's L.R. 18 at ¶ 20. Boothroyd, however, viewed the so-called revision as "nothing more than a rearrangement of the column headings of the 1983 spreadsheet." Boothroyd Decl. at ¶ 14. Once again, Boothroyd and Dewhurst protested through their attorney, putting Poli on notice that they considered this 1984 spreadsheet to be an additional infringement of their work. *Id.*, citing Plaintiff's Exhibit 18 (Letter from Hart to Dempsey of 2/6/85) [attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment].

Dempsey wrote a series of letters to Hart dated 2/8/85, 2/25/85 and 9/16/85 advising Boothroyd and Dewhurst that Poli did not view these new works as infringing and explaining why. The last letter concluded by warning that Poli considered their allegations of infringement to "smack of blatant harassment" and to be an effort to damage his reputation. *See* Plaintiff's Exhibit 49 at 2 [attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment].

As late as August 16, 1985, Hart informed Dempsey by letter that Boothroyd and Dewhurst had finally had an opportunity thoroughly to examine the Poli electronic spreadsheet, which was by then freely available to students and faculty at a U. Mass. engineering lab. Hart stated that after a "thorough analysis and comparison" of the two softwares, there was "no question" that Poli's work was "an unauthorized derivative work." This letter notified Poli, in detail, of plaintiff's specific claims of infringe-

---

**3.** Poli's deposition is transcribed in two volumes. Accordingly, page references are preced-ed by the appropriate volume number.

ment. He also warned that Boothroyd and Dewhurst planned to "monitor the situation carefully" and would resort to "the courts for relief" should Poli attempt to sell or distribute the software. Plaintiff's Exhibit 48 [attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment].

Defendant notes that from September 16, 1985 until early August of 1989, the three professors had no further communications in which complaints were pressed regarding either the 1984 Poli spreadsheet or the software version of the spreadsheet. Defendant's L.R. 18 at 21, citing Poli Affidavit at ¶¶ 8–9 [attached to Defendant's Motion for Summary Judgment]. This silence continued in spite of the fact that, beginning in 1985, the Poli 1984 spreadsheet and software had been offered for sale by the University of Massachusetts....

Boothroyd attributes this quiescence to the high cost of litigation, the "crudity" of Poli's "clearly inferior" spreadsheet, and his reluctance to sue an academic colleague. Boothroyd Decl. at ¶ 14. Plaintiff continued to withhold action against Poli in 1987, even though Boothroyd and Dewhurst learned by then that Poli had prepared several new products which allegedly infringed,[4] as well as a series of professional papers and a 1989 video lecture series which occasionally criticized BDI's software and, plaintiff says, repeatedly reproduced aspects of it without permission. *See* Plaintiff's L.R. 18 at ¶¶ 17–22.

Boothroyd and Dewhurst still viewed the high cost of litigation as a deterrent, especially in light of the potentially small monetary recovery and the lack of a serious commercial threat posed by Poli at this time. *Id.* at ¶ 16. However, they never indicated to Poli that they approved of—or that they would ignore—his infringements.

Magistrate Judge's Report at 9–14 (most footnotes omitted).

Plaintiff's tolerance ended when its principals perceived defendant's activities as a possible commercial threat. In 1989, Richard Adler ("Adler"), a Stanford University graduate student, contacted BDI seeking a license to use BDI's copyrighted material. Plaintiff refused Adler's request, concerned about possible misuse of its product, which had been supplied to Stanford solely for teaching purposes. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit 39 (4/12/89 letter from Dewhurst to Adler). Shortly thereafter, plaintiff's principals read in a trade magazine that Adler's company Sapphire Design Systems, Inc. ("Sapphire"), had obtained a license to use Poli's DFA methodology. Convinced that the material Poli was licensing to Sapphire was BDI's copyrighted material, BDI filed this suit on July 28, 1989.

## C. Factual Underpinnings of Poli's Chapter 93A Claim

Defendant initially identified six documents that he alleged provided the factual basis for his chapter 93A counterclaim. Magistrate Judge's Report at 18–20. Before this Court, he relies on only two of those documents, described as follows by the Magistrate Judge:

■ A two-page December 6, 1989 news release issued by plaintiff, sent from Rhode Island to editors around the country, which summarizes the counts and allegations contained in this lawsuit. Defendant's Exhibit 16 [attached to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment Respecting Defendant's Counterclaims (Aug. 2, 1990)]; Plaintiff's L.R. 18 at ¶ 7. Approximately 10% of these editors were located in the Commonwealth of Massachusetts. Boothroyd Declaration at ¶ 7. BDI obtained the advice of counsel before authorizing is-

---

**4.** This included a 1985 and 1987 spreadsheet, Plaintiff's Exhibits 19 and 20, and corresponding software programs based on—and intended to accompany—the spreadsheets, entitled "Assembly Analysis and Linebalancing" (Revised in 1987 and 1989) and "Automatic As-

sembly Analysis." Boothroyd Decl. at ¶ 15, citing Plaintiff's Exhibits 21 and 22 [attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment].
Magistrate Judge's Report, footnote 6.

suance of this release. Plaintiff's L.R. at ¶ 7.

■ A January 1990 newsletter sent by BDI from Rhode Island to "its readers in the manufacturing engineering community." Defendant's Exhibit 17 at 6 [attached to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment Respecting Defendant's Counterclaims]. The last page of this newsletter contains an announcement regarding BDI's decision to file suit that is substantially similar in tone and content to the December 1989 press release. *Id.* Magistrate Judge's Report at 18–20.

Approximately seven percent of the addressees on BDI's mailing list, to whom the January 1990 newsletters were sent, are located in Massachusetts. T.R. at 25, 35; Correction to June 27, 1990 Declaration of Geoffrey Boothroyd (Aug. 27, 1990).

### D. Defendant's Objections to Recitation of Facts Contained in the Magistrate Judge's Report

1. Poli's Objection to the Statement that he did not Contribute to the Field of DFA Research Under the 1977–1981 NSF Grant

Defendant Poli objects to the Magistrate Judge's statement that:

[w]hen [defendant] was unable to make any progress in the [field of Manual Insertions in the Field of Design for Assembly], Poli concentrated instead on his main area of research, non-traditional machining. It is undisputed that Poli produced nothing under the NSF grant that contributed to the subject of Design for Assembly.

Magistrate Judge's Report at 6, *citing* Defendant's L.R. 18 at ¶ 6; Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims, Exhibit 8 (Poli Deposition at I:55, I:57, I:66).

The Court concludes that evidence of record from the defendant's own mouth supports the Magistrate Judge's factual statement. In his deposition testimony, defendant stated that during the initial period of the NSF grant, he and Boothroyd each had a student working in the DFA field, and that Poli, Boothroyd and the two students met weekly to discuss progress and exchange ideas. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit 57 (Poli Deposition at I:53).

However, in his succeeding testimony, defendant explicitly stated that his share of this research effort was not productive, and that he phased out of this area to undertake research in non-traditional machining and forging. *Id.* at I:55, I:60. On several occasions in the course of his deposition, Poli confirmed that, for reasons beyond his control (an assertion plaintiff contests), he was unable to gather significant DFA data, *id.* at I:55, I:57, I:66, I:69, I:77, and that when he phased out of the field, he had nothing to turn over to a possible successor. *Id.* at I:57, I:66, I:69. *See also* Defendant's Opp.L.R. 18 at ¶ 6 ("In 1977 and 1978, Professor Poli was unable to produce a data base for design for assembly under the NSF grant because the critical parameters required to construct such a data base had not yet been identified."). In light of this ample support for the Magistrate Judge's factual statement, defendant's objection will be overruled.[5]

2. Poli's Objection to the Statement that Boothroyd and Dewhurst Developed Their DFA Software on Their Own Time and at Their Own Expense

Poli also objects to the statement that "once Dewhurst joined the U. Mass. faculty in 1981, he and Boothroyd began work in the Design for Assembly Field on their own time and at their own expense." Magistrate Judge's Report at 7. He asserts (1) that Boothroyd was supported by NSF funds during the initial phase of developing the DFA Software, and (2) he apparently objects to the phrase "at their own expense" on the grounds that plaintiff's prin-

---

**5.** There is a vociferous dispute between the parties about the reasons why Poli made no progress in this facet of his DFA research. However, this dispute is not material to the legal issues in this case. Accordingly, the Magistrate Judge made no finding as to why Poli's 1977–78 DFA research was unproductive, and neither does this Court.

cipals performed some of this work at the University of Massachusetts, on a computer loaned to them by a colleague. Defendant does not contend that this entire project was carried out with NSF support.

During his deposition testimony, Boothroyd stated that he had perhaps continued to receive NSF funding during the initial period when he and Dewhurst were developing their DFA Software. Defendant's Motion for Summary Judgment, Boothroyd Deposition at 242–43. In its opposition to defendant's motion for summary judgment, plaintiff listed as a contested fact the question of whether the software program which is the basis for plaintiff's copyright infringement claim was developed with NSF support. Plaintiff's Opp.L.R. 18 at ¶ 1. It is, however, uncontested that Dewhurst aided in the development of the software and that he never received funding from the 1977–81 NSF grant. In light of this evidence, it is appropriate to qualify slightly the Magistrate's statement of fact. Accordingly, the Court finds that once Dewhurst joined the University of Massachusetts faculty in 1981, he and Boothroyd collaborated on the development of a DFA software program, working at least in part on their own time and without NSF support. It is uncontested, albeit immaterial, that Boothroyd and Dewhurst did at least some of this work at the University of Massachusetts, using a colleague's computer. Defendant's Motion for Summary Judgment, Boothroyd Deposition at 244–45; 247–49.

## III. LEGAL ISSUES

### A. Standard of Review

Summary judgment is appropriate when the material facts in the case, meaning those facts which could affect the outcome of the litigation, are not in dispute, and when the moving party is entitled to judgment as a matter of law. See, e.g., Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir.1989), citing Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making this determination, the Court must view the factual record in the light most favorable to the non-moving party, Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989), citing Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 934 (1st Cir.1987); however, the non-moving party must demonstrate the existence of "specific, provable facts demonstrating that there is a triable issue." Hendrigan, 888 F.2d at 191. The standard remains the same when the parties have filed cross-motions for summary judgment. See, e.g., Borowiec v. Local No. 1570, 889 F.2d 23, 25–26 (1st Cir.1989). With this essential preface in place, the Court turns to the three substantive objections raised by the parties.

### B. Plaintiff's Motion for Summary Judgment on Defendant's Chapter 93A Claim

Although Poli initially pointed to six documents as comprising the factual basis for his Chapter 93A claim against BDI, he now presses his claim based solely on two documents, the December 1989 press release and the January 1990 newsletter. See supra at pages 675–676. The Magistrate Judge concluded that these documents provided an inadequate basis for defendant's chapter 93A counterclaim for two reasons. First, he noted that announcing pending litigation in cases of copyright and patent infringement has been held to be commercially reasonable conduct. Second, he questioned whether documents sent from Rhode Island to recipients around the country qualified as conduct occurring "primarily and substantially" in Massachusetts. Magistrate Judge's Report at 39–41.

In response, defendant argues that notices of pending litigation, if sent in bad faith or with knowledge that the underlying action is groundless, cannot be excused as commercially reasonable conduct. He suggests that as long as the copyright infringement claim between the parties has not been adjudicated, the issue of bad faith, and, therefore, the question of the commercial reasonableness of plaintiff's actions, cannot be decided. Thus, according to defendant, a grant of summary judgment on

this basis is premature. With respect to chapter 93A's requirement that the conduct complained of occur primarily in Massachusetts, defendant renews his contention that the complainant's place of injury is a significant factor in this determination, and that the Magistrate Judge did not give it appropriate weight.

### 1. Notice of Pending Litigation as Basis of Chapter 93A Claim

■ The Court agrees with Poli that if plaintiff instituted its copyright infringement suit knowing that the claim was groundless, and proceeded to send notices of the pending litigation to defendant's potential customers, its conduct would violate chapter 93A. *See, e.g., Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 778–79, 489 N.E.2d 185, 196–97 (1986) (finding violation of chapter 93A when, among other deceptive actions, defendant commenced suit by filing a verified complaint containing a deliberate misstatement and then used existence of litigation as marketing technique to gain advantage over plaintiff). In contrast, if plaintiff had a sound basis for its infringement suit, it was justified in sending out the relatively restrained notices which form the basis of defendant's chapter 93A counterclaim. *See e.g., Abcor, Inc. v. Romicon, Inc.,* 212 U.S.P.Q. (BNA) 679 (D.Mass.1980); *cf. Conceptual Engineering Assocs., Inc. v. Aelectronic Bonding, Inc.,* 714 F.Supp. 1262, 1269 (D.R.I.1989) (if patent owner which has instituted suit acts in good faith, it may notify trade of its patent rights without violating Sherman Antitrust Act); *Airtex Corp. v. Shelley Radiant Ceiling Co.,* 536 F.2d 145, 155–56 (7th Cir.1976) (no unfair competition when party which has good faith belief that patent is being infringed mails notices of infringement to infringer's customers).

■ Furthermore, it does not necessarily follow, even if plaintiff's copyright claim is

ultimately unsuccessful, that plaintiff has violated chapter 93A by instituting suit and following the procedures that a copyright infringement plaintiff normally follows. *See, e.g., Quaker State Oil Refining v. Garrity Oil Co.,* 884 F.2d 1510, 1513 (1st Cir.1989) (in context of chapter 93A claim, fact that party does not prevail on its claims is not signal that claims were groundless). If there is an objectively reasonable basis for a party's claims, that party "ha[s] the right to test them through litigation." *Id.* at 1514.

■ Once plaintiff moved for summary judgment on defendant's chapter 93A counterclaim, it was defendant's responsibility to bring forward some material fact to support his claim that plaintiff had deliberately initiated a baseless infringement suit. *Hendrigan, supra.* The record, viewed in the light most favorable to defendant, is devoid of evidence supporting his position. In fact, to the contrary. As the Magistrate Judge observed, the present record contains sufficient evidence, uncontested by defendant, to warrant committing the infringement issue to a jury. Magistrate Judge's Report at 24; *see supra* note 1. Defendant has admitted that, to produce his 1983 spreadsheet, he copied verbatim questions appearing in Boothroyd and Dewhurst's DFA Software. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit 57 (Poli Deposition at I:95–98).[6] Although there is evidence that Boothroyd received some NSF support while he and Dewhurst developed the DFA Software, defendant has not contested the Magistrate Judge's statement that the DFA software contained original copyrightable material. *See* Magistrate Judge's Report at 7, *citing* Complaint at ¶¶ 7–8 (July 28, 1989). Had defendant produced evidence suggesting that the portions of the DFA Software which he admittedly copied appeared in the uncopyrighted NSF Software and were therefore in the public do-

---

**6.** During his deposition, defendant stated that he copied the questions from software produced with NSF grant support. However, he also stated that the software from which he copied the questions contained a copyright notice, including a date of 1981 and the names Boothroyd and Dewhurst. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit 57 (Poli Deposition at I:97–98). The NSF Software was not copyrighted and so would not have contained a copyright notice.

main, such evidence might have supported the theory that BDI's suit was brought in bad faith. However, Poli has not produced such evidence.

In sum, defendant has failed to meet its burden of producing evidence which, if believed, would demonstrate that plaintiff has knowingly instituted an unjustified copyright infringement suit. Therefore, plaintiff is entitled to summary judgment on defendant's chapter 93A counterclaim.

### 2. Conduct Occurring Primarily and Substantially in Massachusetts

The Magistrate Judge further supported his recommendation that defendant's chapter 93A counterclaim be dismissed by reference to the statutory requirement that the conduct complained of occur "primarily and substantially" in Massachusetts. Mass. Gen.Laws ch. 93A, § 11. Because the Court considers this a somewhat closer issue than did the Magistrate Judge, the Court's decision to grant judgment to plaintiff on defendant's chapter 93A counterclaim does not rest on this ground.

At the outset, the Court notes that the burden of proving that the conduct complained of did not occur primarily and substantially in Massachusetts rests on the defendant in counterclaim, in other words, on BDI. Mass.Gen.Laws ch. 93A, § 11; *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d 1260, 1264 (1st Cir. 1990). The factual basis for defendant's chapter 93A claim consists of the 1989 press release, sent to editors across the country, ten percent of whom were located in Massachusetts, and the 1990 BDI newsletter, sent to individuals on BDI's standard mailing list, approximately seven percent of whom were in Massachusetts.[7] Based on the figures supplied by the parties during oral argument, the Court calculates that close to five hundred individuals in Massachusetts received the newsletter. *See* T.R. at 35, 42. Because plaintiff and defendant are involved in a specialized field, it is probable that at least some of the Massachusetts recipients of the BDI newsletter were aware of Poli's identity and of his recent work in the DFA field. BDI has not suggested otherwise.

Although the Massachusetts courts have addressed the meaning of the phrase "primarily and substantially within the commonwealth" more than once, no bright line concerning its interpretation has emerged. *Clinton Hospital*, 907 F.2d at 1266. In *Clinton Hospital*, the First Circuit Court of Appeals concluded that a district court should consider at a minimum (1) where the defendant committed the unfair practices complained of; (2) where plaintiff received and acted upon the deceptive statements; and (3) the location of plaintiff's injury. However, the First Circuit concluded that this list of factors was not exhaustive. *Id.* at 1265–67.

Focusing on the newsletter alone, close to five hundred Massachusetts individuals and/or businesses, interested to some degree in DFA developments, received a communication from BDI. Although the newsletter originated in Rhode Island, it was directed in part to individuals in the Commonwealth who might have acted on the communication in Massachusetts. BDI has not countered Poli's suggestion that he has lost consulting opportunities in the Commonwealth, an injury occurring in Massachusetts.

In sum, had Poli produced evidence suggesting that the newsletter announced an infringement suit instituted in bad faith, the Court would conclude that whether BDI's conduct occurred primarily and substantially in Massachusetts presented a material issue of disputed fact. Disposition of the claim at the summary judgment stage would not be appropriate. *New England Mutual Life Insurance Co. v. Stuzin*, Civ.Action Nos. 86–2470–S; 86–2471–S, 1990 WL 252171 (D.Mass. Dec. 20, 1990).

---

7. At oral argument, plaintiff's counsel indicated that BDI's standard mailing list comprised "some seven thousand names." T.R. at 42. Plaintiff further indicated that approximately seven percent of those names or addresses were located in Massachusetts. *Id.* at 35. Therefore, the Court concludes that the newsletter was sent to approximately 490 individuals in Massachusetts.

*C. Defendant's Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim on the Basis of Laches and Estoppel*

Before the Magistrate Judge, defendant Poli sought summary judgment on plaintiff's copyright infringement claim on a number of grounds, all of which were rejected by the Magistrate Judge. In his objections to the Magistrate Judge's Report, defendant focuses on a single argument. He contends that plaintiff's copyright infringement claim should be dismissed on the basis of laches and estoppel.

1. Laches

■ "To establish laches, the defendant must show 1) unreasonable and inexcusable delay in filing suit and 2) material prejudice from the delay." *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1461 (Fed.Cir.1990). *See also Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1270 (Fed.Cir. 1990); *Lotus Development Corp. v. Paperback Software International*, 740 F.Supp. 37, 82 (D.Mass.1990). The burden of proving these elements is on the defendant, *Lotus Development Corp.* 740 F.Supp. at 82, and, because this is a motion for summary judgment, the record must be viewed in the light most favorable to plaintiff BDI, the non-moving party on this issue.

Pointing to the correspondence between Hart and Dempsey, defendant argues that plaintiff's principals were fully aware of defendant's allegedly infringing activity by 1985; therefore, the four-year delay in filing suit was unreasonable. Defendant further argues that plaintiff's delay in filing suit misled defendant, who believed that plaintiff was satisfied that defendant's activities were not infringing. Defendant staked his professional reputation on this belief, and continued to publish and deliver lectures incorporating material which BDI now claims violates its copyright.

Although defendant's argument has superficial appeal, the Court is not convinced that plaintiff's delay in filing suit was unreasonable. Factually, this case presents a remarkably close parallel to *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, No. 90–1137, slip op., 1991 WL 62407 (Fed.Cir. April 25, 1991), a patent infringement case recently decided by the Federal Circuit Court of Appeals. In *Aukerman*, plaintiff informed defendant in 1979 that defendant was infringing plaintiff's patent, and that plaintiff intended to enforced its patent rights. Defendant responded that if plaintiff wanted to sue defendant for the minimal amount of money involved, plaintiff should go ahead. Plaintiff delayed *eight* years before filing suit. *Id.* at 8.

In reversing the district court's grant of summary judgment on the basis of laches and estoppel, the *Aukerman* court stated:

> [Defendant] informed [plaintiff] that its infringement was minimal. [Plaintiff] could reasonably have made a judgment that, considering the cost of litigation and the value of the lost business, it was not in the best interests of the company to pursue [defendant] at that time. But, [plaintiff] alleges, some years later the situation had changed. [Plaintiff] presented evidence that [defendant] substantially increased its infringing activities. When viewed in a light most favorable to [plaintiff], the evidence of [plaintiff's] earlier understanding regarding [defendant's] minimal infringing activities and the evidence of [defendant's] increased infringing use of the patented method provides a reasonable basis on the facts of this case for the timing of [plaintiff's] suit and does not support a contrary summary judgment as a matter of law.

*Id.* at 9.

In the case *sub judice*, defendant responded to plaintiff's stated concerns first by indicating that it would withdraw a particular spreadsheet from circulation, and later by refusing to address directly plaintiff's concerns about the revised electronic spreadsheet on the grounds that the copyright in the electronic spreadsheet was owned by DEC. In addition, plaintiff produced uncontested evidence that the electronic spreadsheet became obsolete when DEC abandoned production of the computer for which it was designed. Defendant's alleged infringing activities were, from

plaintiff's perspective, minimal if annoying, and plaintiff might reasonably have judged that it was not worth the cost of bringing suit. *Aukerman, supra; Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 592 F.2d 651, 655 n. 4 (2d Cir.1978) (plaintiff's delay in asserting rights no ground for estoppel and laches defense when enforcing rights was not worth the cost of litigation). Viewing the record in the light most favorable to plaintiff, defendant's infringing activities escalated, and for the first time presented a commercial threat, when he agreed to license his DFA methodology to Sapphire. In sum, on this record, the Court is not convinced that plaintiff's delay in bringing suit was unreasonable.

Furthermore, defendant's claim of prejudice is not wholly convincing. In response to Hart's August 16, 1985 letter documenting plaintiff's assertion of continuing copyright violations, counsel for defendant stated that defendant's activities were not infringing, and that plaintiff's repeated expressions of concern were "a deliberate attempt to damage Poli's reputation." Letter of Dempsey to Hart (Sept. 10, 1985) (attached as Exhibit 49 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment). The evidence can be viewed as suggesting that defendant's conduct did not depend on a reasonable belief that plaintiff was satisfied with the status quo but rather on defendant's belief that plaintiff's accusations lacked a sound legal basis. *See, e.g., Meyers,* 912 F.2d at 1463 (defendant's claim of prejudice unconvincing when evidence suggested that defendant's course of conduct was unaffected by plaintiff's activities). The Court agrees with the Magistrate Judge that laches does not bar plaintiff's copyright infringement claim.

### 2. Estoppel

■ The elements of estoppel differ somewhat from those of laches. The parties have accepted the legal standard enunciated by the Magistrate Judge:

"1) [the] party to be estopped [BDI] must know the facts; 2) [BDI] must intend that [its] conduct [i.e., failure to protest after 1985] shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; 3) [Poli] must be ignorant of the true facts; and 4) he must rely on [BDI's] conduct to his injury."

Magistrate Judge's Report at 31, *citing Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.), *cert. denied* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960); *Hearst Corp. v. Stark,* 639 F.Supp. 970, 980 n. 14 (N.D.Cal.1986). The Federal Circuit Court of Appeals noted in *Aukerman, supra,* that "[e]stoppel is conceptually different from laches in that it is *conduct,* not time, that triggers judicial intervention." *Aukerman,* slip op. at 7 (emphasis added). In addition, the *Aukerman* court noted that "because estoppel is even more potent than laches" in barring plaintiff's claim, "courts must be that much more chary in imposing arbitrary judgments on market-based decisions." *Id.*

Certainly BDI's principals possessed at least some knowledge of Poli's allegedly infringing activities in 1985. However, the remaining evidence does not support a finding that—as a matter of law and viewing the record in the light most favorable to BDI—BDI's conduct reasonably induced Poli to believe that BDI was satisfied that Poli was no longer infringing its copyright. Hart's August 16, 1985 letter does not announce that legal action is imminent. Rather, it cautions that BDI's principals "will monitor the situation carefully," and will assert their rights if Poli attempts to sell or distribute infringing software. The letter also documents Boothroyd and Dewhurst's belief that Poli's activities continued to infringe BDI's copyrights. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit 48.

In addition, as the Court has already explained, defendant's response does not unambiguously indicate reliance on plaintiff's acquiescence in his activities. Rather, Dempsey's September 16, 1985 letter to Hart implies that defendant did not believe his activities were infringing BDI's copyrights. Dempsey suggested that Poli was using material in the public domain rather than copyrighted material, and that defen-

dant bore no responsibility for the 1984 electronic spreadsheet. A reasonable interpretation of the evidence is that, rather than relying on plaintiff's acquiescence, defendant was proceeding in defiance of plaintiff's complaints. In these circumstances, defendant is not entitled to summary judgment on his estoppel defense. *See, e.g., Meyers,* 912 F.2d at 1463 (defendant has not demonstrated prejudice where evidence suggests that defendant would have pursued the same course of conduct even if plaintiff had filed suit sooner); *Lotus Development Corp.,* 740 F.Supp. at 83 (defendant's claim of prejudice rejected where its defense was that copyright infringement suit was frivolous).

*D. Defendant's Motion for Summary Judgment on Plaintiff's Lanham Act Claim*

■ The version of the Lanham Act in effect at the time relevant to this suit read as follows:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Lanham Act § 43(a), 15 U.S.C. § 1125(a) (amended effective Nov. 16, 1989).

■ In its objections to the Magistrate's Report, plaintiff identifies the following factual basis for its Lanham Act claim: 1) defendant's alleged failure to acknowledge the source of various materials, such as diagrams, formulas and charts, that appear in defendant's own productions such as his 1989 videotape; and 2) the fact that defendant places his own copyright notice on his materials, such as his 1989 videotape, without acknowledging that these materials contain the copyrighted material of others.[8] Plaintiff labels this as "reverse palming off," i.e., an attempt to pass off as defendant's own work material actually produced by another. Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 25; *see, e.g., Smith v. Montoro,* 648 F.2d 602, 605 (9th Cir.1981) (reverse palming off occurs when someone obliterates or removes the original trademark before reselling goods produced by someone else). Conversely, "palming off" is "the selling of a good or service of one's own creation under the name or mark of another." *Montoro,* 648 F.2d at 604, *citing* 2 J. McCarthy, *Trademarks and Unfair Competition,* § 25.1 (1973); 1 R. Callman, *Unfair Competition, Trademarks and Monopolies,* § 18.2(b)(1), at 294 (1980 Supp. to 3rd ed.).

Defendant argues that First Circuit case law interpreting section 43(a) encompasses only those claims which involve "attempts to appropriate the goodwill associated with a competitor's trademark by means of a confusingly similar marking and packaging which would create the impression that the products of the defendant originated with the plaintiff," *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 560–61 (1st Cir.1982), in other words, palming off. *See also Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 160 (1st Cir.1977)

---

**8.** Plaintiff also complains that Poli inappropriately identifies his work as developed "with the support of the National Science Foundation." Plaintiff's Objection to the Report and Recommendation Regarding Cross Motions for Summary Judgment at 3 (Jan. 28, 1991) ("Plaintiff's Objection"). Plaintiff does not allege that Poli identifies any particular NSF grant as the

source of his funding. Absent that essential nexus, the Court finds wholly unpersuasive plaintiff's argument that this conduct could be construed as an attempt by defendant "to confuse customers onto believing that Poli was involved in basic NSF research in Design for Assembly." *Id.* at 4. Accordingly, the Court's analysis takes no account of this allegation.

(in palming off case, basis for section 43(a) claim is "use of a mark in interstate commerce which is likely to cause confusion or to deceive purchasers concerning the source of goods"); *Samson Crane Co. v. Union Nat. Sales,* 87 F.Supp. 218 (D.Mass. 1949), *aff'd per curiam,* 180 F.2d 896 (1st Cir.1950).

Although the case law in the First Circuit is somewhat ambiguous, and despite the fact that restrictive interpretations of section 43(a) have been criticized, *see, e.g., Schroeder v. Lotito,* 577 F.Supp. 708, 721–24 (D.R.I.1983) (Selya, D.J.), the weight of authority in this circuit and in this district favors defendant's position. *See, e.g., Clamp–All Corp. v. Cast Iron Soil Pipe Institute,* 3 U.S.P.Q.2d 1018, 1021–23, 1987 WL 9760 (D.Mass.1987), *aff'd* 851 F.2d 478 (1st Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989); *Quincy Cablesystems, Inc. v. Sully's Bar,* 650 F.Supp. 838, 844–46 (D.Mass.1986); *Salomon/North America, Inc. v. AMF Inc.,* 484 F.Supp. 846, 848–49 (D.Mass.1980). Most recently, the First Circuit appeared to acknowledge that the restrictive interpretation of section 43(a) announced in *Samson Crane* remains the controlling law in the First Circuit. *See Clamp–All Corp.,* 851 F.2d at 491 ("We therefore continue to assume the validity of *Samson Crane,* and postpone its reconsideration for another day."). The Court concludes that in the First Circuit a section 43(a) plaintiff must allege that defendant has misappropriated or misused a trademark or something analogous to a trademark, deceiving consumers as to the source of goods or services and trading on plaintiff's goodwill, to state a valid claim.

In light of the First Circuit's recent statement, this Court may not, as plaintiff requests, overrule *Samson Crane.* Perhaps anticipating this response, plaintiff argues that even under the *Samson Crane* interpretation of section 43(a), it can maintain its claim. In support of its position, plaintiff takes issue with the Magistrate Judge's discussion of *Brandon v. Regents of the University of California,* 441 F.Supp. 1086 (D.Mass.1977), and relies on *Montoro, supra.*

In *Brandon,* plaintiff was the producer and director of a successful short film titled "Anything You Want To Be." Defendant first attempted to purchase a copy of plaintiff's film and, when the request was refused, began to distribute a competing film of very similar content, which had been titled "Anything They Want To Be." *Id.* at 1088–89. Plaintiff brought no copyright infringement claim in *Brandon.* Instead, she relied on section 43(a) of the Lanham Act. The case was tried to Judge Caffrey, who ruled in plaintiff's favor on her Lanham Act claim.

The Magistrate Judge, while noting that *Brandon* contained some factual similarities to the case at bar, distinguished it on the basis that the *Brandon* plaintiff had not brought a copyright claim. In its objection to the Magistrate Judge's Report, plaintiff stresses that much of the conduct it complains of is not prohibited by copyright law, but may be prohibited by the Lanham Act. Plaintiff's Objection at 2–5. Thus, in plaintiff's view, *Brandon* supports plaintiff's position.

More significant, in the Court's view, is the fact that *Brandon* concerned conduct cognizable under *Samson Crane* and that BDI's claim does not. In *Samson Crane,* the court stated:

It is clear ... that the primary purpose of the Act was to eliminate deceitful practices in interstate commerce involving the misuse of trademarks, but along with this it sought to eliminate other forms of misrepresentations which are of the same general character even though they do not involve any use of what can technically be called a trademark.

*Samson Crane,* 87 F.Supp. at 222. In *Brandon,* defendant marketed a film under a title very similar to the title of plaintiff's film. The Court found that the similarity of titles was a source of confusion for those ordering films, and that defendant was trading on the goodwill that plaintiff's film had generated. In short, by using a very similar title, defendant was palming its film off as plaintiff's film. Thus, in a

significant way, *Brandon* is factually distinguishable from the case at bar.

In its Opposition to Defendant's Motion for Summary Judgment, plaintiff relied on *Montoro, supra,* a Ninth Circuit case, to support its position that it has stated a valid Lanham Act claim. As the Magistrate Judge noted, the Ninth Circuit espouses a broad interpretation of section 43(a) which is foreclosed in the First Circuit. *See Montoro,* 648 F.2d at 604 (law of unfair competition has moved beyond fraudulent passing off to encompass any kind of commercial competition society deems unfair).

Moreover, *Montoro* presents facts which this Court believes could not give rise to a section 43(a) claim in this circuit. In *Montoro,* plaintiff contracted to star in a film produced by an Italian film company. Under the terms of the contract, plaintiff was supposed to receive star billing in the screen credits. Instead, prior to distribution, plaintiff's name was removed from the screen credits and replaced with another actor's name. *Id.* at 603. The court described this as "reverse palming off." *Id.* at 607. *Montoro* cannot be described as a case in which consumers might be confused as about the source of goods or services they were purchasing.

In sum, the Court concludes that, based on the undisputed facts in this case, plaintiff has failed to state a section 43(a) claim. Defendant is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the reasons stated above, the Court ADOPTS the conclusions in the Magistrate Judge's Report as follows:

1. The Court GRANTS plaintiff's motion for summary judgment on defendant's chapter 93A counterclaim.

2. The Court GRANTS defendant's motion for summary judgment insofar as it relates to plaintiff's Lanham Act claim (count two), and DENIES defendant's motion for summary judgment insofar as it relates to plaintiff's copyright claim (count three).

It is So Ordered.

## REPORT AND RECOMMENDATION REGARDING CROSSMOTIONS FOR SUMMARY JUDGMENT [1]

### January 15, 1991

MICHAEL A. PONSOR, United States Magistrate Judge.

## I. INTRODUCTION.

In this four-count complaint plaintiff, Boothroyd Dewhurst, Inc. ("BDI"), charges defendant, Corrado Poli ("Poli"), with violations of the Copyright Act, 17 U.S.C. §§ 101 *et seq.,* and the Lanham Act, 15 U.S.C. § 1125, arising out of Poli's development of a spreadsheet, companion software and related materials that allegedly duplicate products created by BDI and its predecessor, Boothroyd & Dewhurst, Inc. ("B & D, Inc."). In Counts III and IV, plaintiff invokes this court's pendent jurisdiction to state claims for unfair competition under Mass.Gen.Laws ch. 93A, §§ 2 and 11, as well as Massachusetts common law. Poli has responded with a two-count counterclaim in which he alleges that plaintiff—through its principals Geoffrey Boothroyd ("Boothroyd") and Peter Dewhurst ("Dewhurst")—interfered with his professional and business relations by committing unfair and deceptive acts in violation of ch. 93A, and engaged in unfair methods of competition under the common law of Massachusetts.

Each party has moved for summary judgment on its opponent's claims. For the reasons set forth below, this court will recommend that defendant's motion for summary judgment be allowed with respect to Count II, the Lanham Act claim, but denied with respect to Counts I, III and IV, and that plaintiff's motion be allowed as to defendant's counterclaims.

---

1. This matter has been referred to the court for report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates in the

United State District Court for the District of Massachusetts, 28 U.S.C. § 636(b)(1)(B).

## II. FACTUAL BACKGROUND.

### A. *Summary Judgment Standard.*

In addressing a motion for summary judgment, it is axiomatic that this court will view the facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party. *Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 804 (1st Cir.1987).

The basic inquiry in a summary judgment motion is whether "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). (Emphasis in original.)

The requirement that disputes be "material" is especially pertinent to this case. The embittered relationship between the principals in this action has generated disputes about almost everything; many, or most, of these conflicts are not material to the issues raised by the motions.

At the summary judgment stage, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510. In this regard, it is important to note that "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252, 106 S.Ct. at 2512. The issue then is "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* (Citation omitted.)

In other words, in order to determine if a genuine factual issue exists to defeat summary judgment, the actual quantum and quality of proof necessary for the plaintiff to prevail must be considered. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 254, 106 S.Ct. at 2513. "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." The question then becomes "whether a jury could reasonably find *either* that the plaintiff proved [its] case by the quality and quantity of evidence required by the governing law *or* that [it] did not." *Id.*

However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513, *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–9, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

"[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). As noted by the *Celotex* court, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Id.* at 323–4, 106 S.Ct. at 2553.

On crossmotions for summary judgment, such as those now before the court, the factual perspective shifts—each party's motion is viewed in the light of facts favoring its adversary.

Rule 56(f) provides an "escape hatch" for a party who "genuinely requires additional time to marshall 'facts essential to justify [its] opposition' when confronted by a summary judgment motion." *Paterson–Leitch*

*v. Massachusetts Electric,* 840 F.2d 985, 988 (1st Cir.1988), citing *Herbert v. Wicklund,* 744 F.2d 218, 221 (1st Cir.1984). However, to invoke 56(f) a request for additional discovery must be made "in some authoritative manner," must "articulate some plausible basis for the party's belief that specified 'discoverable' material facts likely exist which have not come in from the cold" and must "demonstrate good cause for failure to have conducted discovery earlier." *Paterson–Leitch,* 840 F.2d at 988.

With this general background, the court turns to the facts of this case.

### B. *Facts of Record.*[2]

While, as noted, numerous peripheral disputes clutter the record, the skeleton of basic facts is largely undisputed and relatively few *material* disagreements appear. The following facts are undisputed, except where conflicts are noted.

This litigation is the culmination of an increasingly acrimonious dispute among three academics regarding which of them is entitled to receive credit for—and profit from—research initiated at the University of Massachusetts in the late 1960's in an engineering field known as "Design for Manufacturability." The plaintiff corporation, BDI, is a Rhode Island company formed in 1985 and owned by Professors Boothroyd and Dewhurst. BDI creates and markets software and related materials in a sub-field of "Design for Manufacturability." It is a successor to B & D, Inc., a Massachusetts corporation formed in December 1983 and dissolved in 1985 when the principals left the University of Mass. at Amherst for the University of Rhode Island. Plaintiff's L.R. 18 at ¶ 1, citing Boothroyd Decl. at ¶ 2.

From 1967 until 1985, the defendant, Professor Poli, and Professor Boothroyd were colleagues in the Mechanical Engineering Department at U. Mass./Amherst. *Id.* at ¶ 2; Defendant's L.R. 18 at ¶ 1. From about 1973 through 1982, Poli and Boothroyd collaborated in the field of Design for Manufacturability and its sub-area, Design for Assembly. Defendant's Opp.L.R. 18 at ¶ 2, citing Poli Dep., Vol. 1 at 17–18, 49–53, 71–74 and 79–80.

1.  Collaboration at U. Mass. on the NSF Grant.

Beginning in 1978 and continuing through 1981, Boothroyd and Poli served as investigator and co-principal investigator, respectively, in a research program entitled "Design for Manufacturability," funded by successive grants from the National Science Foundation ("NSF") to the University of Massachusetts. Defendant's L.R. 18 at ¶ 2, citing Defendant's Exhibits 1 and 2.

Poli originally agreed to work on two aspects of the NSF research: Design for Non–Traditional Machining and Manual Insertions in the Field of Design for Assembly. When he was unable to make any progress in the latter field, Poli concentrated instead on his main area of research, non-traditional machining. It is undisputed that Poli produced nothing under the NSF grant that contributed to the subject of Design for Assembly. *Id.* at ¶ 6; Plaintiff's Exhibit 8 (Poli Dep. at 55, 57, 66).

Two of the products that resulted from the U. Mass. research program were a Handbook entitled "Design for Assembly (1980)" ("NSF Handbook") and a software program. Def.'s L.R. 18 at ¶ 3, citing Defendant's Exhibit 3 and Boothroyd Dep. at 168–178. The NSF Handbook was published but not copyrighted. Defendant's Exhibit 3.

2.  Dewhurst's Arrival at U. Mass. and His Participation in Subsequent Research.

In 1980 Professor Dewhurst arrived at U. Mass./Amherst as a visiting professor at Boothroyd's suggestion. Boothroyd Decl. at ¶¶ 3 and 7. He did not serve either

---

**2.** Because these are crossmotions, each party has submitted a L.R. 18 statement of undisputed facts in support of summary judgment as well as a statement of disputed facts in opposition to summary judgment. For ease of reference, these will be referred as L.R. 18 and Opp.L.R. 18.

as an investigator or co-principal investigator in the research program. Defendant's L.R. 18 at ¶ 6. In fact, by early 1980 the NSF had declined to fund further work in the Design for Assembly field. Boothroyd Decl. at ¶ 8. However, once Dewhurst joined the U. Mass. faculty in 1981, he and Boothroyd began work in the Design for Assembly field on their own time and at their own expense. Boothroyd Decl. at ¶¶ 3 and 8.

In late 1981, utilizing at least some of the results from the U. Mass. research program, Boothroyd and Dewhurst collaborated on and completed a microcomputer version of a software package entitled "Design for Assembly Software Tool Kit" (the "DFA Software"). The copyright registration notice indicates this software was originally copyrighted in January of 1982. Defendant's L.R. 18 at ¶ 7, citing Boothroyd Dep. at 241–279; Defendant's Exhibit 6 (copy of copyright registration No. TX 1–420–925). This software, used with related materials, was intended to assist designers in evaluating the difficulties of assembly of their products. It contained original copyrightable material produced by Boothroyd and Dewhurst. Complaint at ¶¶ 7–8. The date of actual registration of the copyright on the DFA Software is October 15, 1984. This registration states that the copyright was assigned to B & D, Inc. "at the time of incorporation." *Id.* at ¶ 9; Defendant's Exhibit 6 at ¶ 4.

On November 15, 1982 Boothroyd and Dewhurst published a handbook entitled "Design for Assembly" ("DFA Handbook"). Like the DFA Software, the Handbook incorporated some of the prior work done for the research program at U. Mass., plus additional materials wholly originated by Boothroyd and Dewhurst. Complaint at ¶ 10. This Handbook copyright was also registered by Boothroyd and Dewhurst, effective October 15, 1984, and assigned to B & D, Inc. as of the time of its incorporation. Defendant's Exhibit 7 (copy of copyright registration No. TX 1–425–994); Complaint at ¶ 11.

As early as 1982, Boothroyd and Dewhurst had begun to generate significant industrial interest and support for their work through numerous industry presentations and articles in the technical and trade press. Boothroyd Decl. at ¶ 9. They formed B & D, Inc. in December of 1983 to market the DFA Software and related materials. Plaintiff's L.R. 18 at ¶ 3; Boothroyd Declaration at ¶¶ 2 and 8. By the time they left U. Mass. to join the faculty of the University of Rhode Island in 1985, industry interest and support had grown. In 1985, they dissolved B & D, Inc. in order to form the plaintiff company, BDI, a Rhode Island corporation. *Id.*

### 3. Poli's Alleged Infringements, Beginning with His 1983 Spreadsheet.

A heated, but immaterial, dispute exists regarding Poli's experience and status in the Design for Assembly field. Plaintiff contends that Poli did not turn his own attention to the field of Design for Assembly until the early 1980's, after Boothroyd and Dewhurst had begun to achieve widespread recognition for their work. Boothroyd Decl. at ¶ 11. Defendant vehemently disagrees. There is *no* dispute that in 1983, Poli produced a Design for Assembly spreadsheet that prompted Boothroyd and Dewhurst to seek legal advice and exacerbated the escalating hostility between the parties.

By 1983 Poli had become a consultant for Digital Equipment Corporation ("DEC").[3] Boothroyd avers that he and Dewhurst "allowed" Poli to use their copyrighted DFA Software, which was apparently being used by DEC with Boothroyd and Dewhurst's permission. Boothroyd Decl. at ¶ 11. He asserts that, without their knowledge or approval, Poli then created and distributed a so-called spreadsheet derived *directly* from Boothroyd and Dewhurst's DFA Software, thereby infringing on BDI's copyright. Specifically, plaintiff alleges that Poli copied the questions on the top of the spreadsheet from those which appear on the screen displays of BDI's software.

---

**3.** No precise dates or information appears on the record, but at deposition Poli indicated that

he had served as a paid consultant for DEC since the early '80s. Poli Dep. at 86.

Poli also used the novel "partial silhouettes" that Boothroyd and Dewhurst had created to function along with the questions to allow programmers to make the design calculations more quickly. *Id.* at ¶¶ 8 and 11.

Adding insult to injury, at least from plaintiff's point of view, Poli copyrighted this derivative work and affixed a 1983 copyright notice to the spreadsheet naming himself as author and copyright owner. *Id.* at ¶ 11; Plaintiff's Exhibit 14 (copy of Poli's registration form No. TX 1-493-573). Dated October 30, 1984, this copyright registration not only lists Poli as the author of the entire spreadsheet but also fails to indicate the existence of pre-existing material upon which his work was based.[4] *Id.*

Plaintiff also asserts that defendant admits that he "adapted" the questions directly from the DFA Software. Plaintiff's L.R. 18 at ¶ 4. The one-page deposition excerpt cited by plaintiff indicates that the defendant concedes that he copied the questions "verbatim" from software he identifies as being produced "during the [1977–1982] NSF grant." Plaintiff's Exhibit 8 (Poli Dep. at 95).

For his part, Poli does not dispute that he prepared the 1983 spreadsheet to be used in conjunction with Boothroyd and Dewhurst's copyrighted DFA Software. Defendant's L.R. 18 at ¶ 17. However, he insists that his spreadsheet was "adapted, not derived" from software "developed in part under [the] NSF grant." Defendant's Opp.L.R. 18 at ¶ 4, citing Poli Dep. at 92–96.

According to Boothroyd, Poli also incorporated material on the back of his spreadsheet that was not his own work but was instead a reproduction of figures that Boothroyd had adapted for his own work with permission from other researchers in the field. Boothroyd did not become aware of these figures until he viewed them during discovery. Boothroyd Decl. at ¶ 12.

In 1984 B & D, Inc. learned that Poli had also prepared a software package for DEC

entitled "Electronic Spreadsheet," believed by plaintiff to be based upon both the derivative 1983 Poli spreadsheet as well as plaintiff's copyrighted DFA Software and Handbook. The title page of the electronic spreadsheet actually lists Poli as one of three co-authors and indicates that DEC owns the 1984 copyright. *See* Plaintiff's Exhibit 16. Through its attorney, William E. Hart ("Hart"), plaintiff's predecessor immediately complained to Poli. *See* Hart Letter to Poli of 10/19/84 (Plaintiff's Exhibit 15).

This letter was forwarded to Poli's attorney, John J. Dempsey ("Dempsey"), who replied on November 1, 1984 that Poli "has absolutely no intention of infringing ..." and that any similarities resulted from Poli's "bona fide attempt to provide a graphic aid for the user of [the B & D, Inc.] software." Defendant's Exhibit 4. Moreover, Dempsey informed Hart that DEC owned the copyright for the accused software and that in order to avoid any further disputes regarding the spreadsheet, Poli had decided, "effective immediately, to abort any further distribution or use of this spreadsheet." *Id.*

According to plaintiff, Boothroyd and Dewhurst relied on Dempsey's assurances until they learned that Poli had produced a new, revised spreadsheet in late 1984, "Assembly Analysis and Linebalancing Spreadsheet" (Plaintiff's Exhibit 17), and an associated software version, both of which Poli considered to be non-infringing. Defendant's L.R. 18 at ¶ 20. Boothroyd, however, viewed the so-called revision as "nothing more than a rearrangement of the column headings of the 1983 spreadsheet." Boothroyd Decl. at ¶ 14. Once again, Boothroyd and Dewhurst protested through their attorney, putting Poli on notice that they considered this 1984 spreadsheet to be an additional infringement of their work. *Id.*, citing Plaintiff's Exhibit 18 (Letter from Hart to Dempsey of 2/6/85).

---

**4.** The Copyright Registration form specifically requests this information at Section 6. Poli did not fill it in.

Dempsey wrote a series of letters to Hart dated 2/8/85, 2/25/85 and 9/16/85 advising Boothroyd and Dewhurst that Poli did not view these new works as infringing and explaining why. The last letter concluded by warning that Poli considered their allegations of infringement to "smack of blatant harassment" and to be an effort to damage his reputation. *See* Plaintiff's Exhibit 49 at 2.

As late as August 16, 1985, Hart informed Dempsey by letter that Boothroyd and Dewhurst had finally had an opportunity thoroughly to examine the Poli electronic spreadsheet, which was by then freely available to students and faculty at a U. Mass. engineering lab. Hart stated that after a "thorough analysis and comparison" of the two softwares, there was "no question" that Poli's work was "an unauthorized derivative work." This letter notified Poli, in detail, of plaintiff's specific claims of infringement.[5] He also warned that Boothroyd and Dewhurst planned to "monitor the situation carefully" and would resort to "the courts for relief" should Poli attempt to sell or distribute the software. Plaintiff's Exhibit 48.

Defendant notes that from September 16, 1985 until early August of 1989, the three professors had no further communications in which complaints were pressed regarding either the 1984 Poli spreadsheet or the software version of the spreadsheet. Defendant's L.R. 18 at 21, citing Poli Affidavit at ¶¶ 8–9. This silence continued in spite of the fact that, beginning in 1985, the Poli 1984 spreadsheet and software had been offered for sale by the University of Massachusetts. The proceeds from these sales went not directly to Poli, but to a University research account upon which he was able to draw a limited summer salary. Defendant's L.R. 18 at ¶¶ 22–25, citing Poli Affidavit at ¶ 10.

Boothroyd attributes this quiescence to the high cost of litigation, the "crudity" of Poli's "clearly inferior" spreadsheet, and his reluctance to sue an academic colleague. Boothroyd Decl. at ¶ 14. Plaintiff continued to withhold action against Poli in 1987, even though Boothroyd and Dewhurst learned by then that Poli had prepared several new products which allegedly infringed,[6] as well as a series of professional papers and a 1989 video lecture series which occasionally criticized BDI's software and, plaintiff says, repeatedly reproduced aspects of it without permission. *See* Plaintiff's L.R. 18 at ¶¶ 17–22.

Boothroyd and Dewhurst still viewed the high cost of litigation as a deterrent, especially in light of the potentially small monetary recovery and the lack of a serious commercial threat posed by Poli at this time. *Id.* at ¶ 16. However, they never indicated to Poli that they approved of—or that they would ignore—his infringements.

### 4. Matters Come to a Head.

This stalemate broke in 1989 when Boothroyd and Dewhurst learned that a company called Sapphire Design Systems ("Sapphire") was introducing a computer program that would compete with BDI's products. Formed by Richard Adler ("Adler"), a Stanford University graduate student with access to BDI software that had been supplied to Stanford solely for teaching purposes, Sapphire approached BDI for a license to use its copyrighted works. *Id.* at ¶ 23, citing Plaintiff's Exhibit 38. Shortly after plaintiff refused this request, its principals read in a May 1989 *MacWEEK* article that Poli had licensed Design for Assembly "methodologies" developed by himself along with another University of Massachusetts professor, Robert Graves, to Sapphire. Plaintiff's Exhibit 39 (Letter from Plaintiff to Sapphire of 4/12/89) and Plaintiff's Exhibit 41 (*MacWEEK*

---

**5.** Hart enclosed a photocopy of page four and Exhibit G–1 of Boothroyd and Dewhurst's written analysis to document the infringement. *See* Plaintiff's Exhibit 48 at 1, 3 and 4.

**6.** This included a 1985 and 1987 spreadsheet, Plaintiff's Exhibits 19 and 20, and correspond-

ing software programs based on—and intended to accompany—the spreadsheets, entitled "Assembly Analysis and Linebalancing" (Revised in 1987 and 1989) and "Automatic Assembly Analysis." Boothroyd Decl. at ¶ 15, citing Plaintiff's Exhibits 21 and 22.

article). This lawsuit was filed in Boston on July 28, 1989 and immediately transferred to the Western Section.

5. Allegations Regarding Ownership and Recordation of the Copyrights for Plaintiff's Software and Handbook.

As noted above, it is undisputed that plaintiff's predecessor corporation—B & D, Inc.—was incorporated in Massachusetts in 1983. The copyright registration certificates for the copyrights at issue here, Design for Assembly Software Tool Kit (No. TX 1–420–925) and Design for Assembly Designer's Handbook (No. TX 1–425–994), indicate that Boothroyd and Dewhurst assigned ownership of the two copyrights to B & D, Inc. as of the date of its incorporation. *See* Plaintiff's Exhibits 8 and 9. The parties also agree that this Massachusetts corporation was dissolved on August 1, 1985. *See* Defendant's L.R. 18 at ¶ 10.

While the defendant acknowledges that plaintiff, BDI, is a Rhode Island corporation formed by B & D, Inc. to replace its predecessor, *see* Defendant's L.R. 18 at ¶ 11, Poli asserts that: 1) no written instrument of conveyance or notice or memorandum regarding the transfer of these copyrights was prepared prior to the filing of this lawsuit, Defendant's L.R. 18 at ¶¶ 12–13, citing Dewhurst Dep. at 96–98, and that 2) no written instrument recording the transfer of the copyright from B & D, Inc. to BDI was filed in the copyright office prior to the commencement of this suit. *Id.* at ¶¶ 14–16, citing Defendant's Exhibit 10 (Statement of James C. Roberts, head of the United States Copyright Office Reference and Bibliography Section).

Only the second of these two contentions is borne out by the record before this court. Plaintiff asserts that ownership of the copyrights at issue here was transferred in writing to it by its predecessor in 1985. Plaintiff's Opp.L.R. 18 at ¶ 3. In support of this contention, plaintiff has submitted a copy of the August 1, 1985 Plan of Reorganization, by which B & D, Inc. was dissolved, and the resolutions adopting this Plan by the unanimous written consent of its two shareholders, Boothroyd and Dewhurst. *See* Plaintiff's Exhibit 45.

This Plan provides, *inter alia:*

1) That in anticipation of their relocation to Rhode Island, the two Shareholders state that they wish to dissolve the Massachusetts corporation in order to incorporate in Rhode Island and continue the business of the Massachusetts corporation using the name BDI. *Id.* at 1.

2) That the Shareholders shall resolve to transfer all of the Massachusetts corporation's assets to the Rhode Island corporation as soon as it is practical and that such transfer shall include *"every copyright of which the Massachusetts corporation is owner, all intellectual property of the Massachusetts corporation and each and every other asset of the Massachusetts corporation."* *Id.* at 2, ¶ 4. (Emphasis added.)

3) That the Shareholders as Directors of the Rhode Island corporation bind themselves to receive all the assets and assume all the liabilities of the Massachusetts corporation. *Id.* at 3, ¶ 6.

While it is thus beyond dispute that the copyrights were handed from the Massachusetts to the Rhode Island corporation, it is equally clear that plaintiff did not record an instrument of transfer of the copyright registrations with the United States Copyright Office until *after* this suit was initiated. On February 20, 1990, nearly seven months after the suit was filed, the Copyright Office issued a Certificate of Recordation which states in pertinent part that plaintiff acquired ownership of the two copyrights and their respective registrations effective September 18, 1985, and that the Certificate constitutes a reaffirmation and ratification of the assignment to BDI of the entire right, title and interest in the two copyrights. *See* Plaintiff's Exhibit 46.

6. Additional Facts Material to Defendant's Counterclaims.

The gravamen of Professor Poli's counterclaims is that actions taken by Boothroyd and Dewhurst prior to and in connection with the filing of this lawsuit im-

pugned his name, damaged his reputation as an expert in the field of design for assembly, and injured him financially. He cites two lost business opportunities which he attributes to the filing of this lawsuit: 1) Sapphire's decision to decline to go forward with its planned incorporation of his DFA methodology into its standard product, and 2) the loss of an opportunity to participate as a contributing author to a textbook entitled *Computer Applications In Manufacturing.* Defendant's Opp.L.R. 18 at ¶¶ 13–14, citing Defendant's Exhibit 9 (Defendant's Supplemental Responses to Plaintiff's Interrogatory No. 5).

In support of these allegations of pecuniary and non-pecuniary damages, Poli further asserts, in disagreement with plaintiff, that he conducted research in the field of Design for Manufacturability and its subarea, Design for Assembly, "long prior to 1981." *See* Defendant's Opp.L.R. 18 at ¶ 1, citing Defendant's Response to Interrogatory No. 2 and documents cited in Defendant's Exhibit 2. He also states that he has written and published articles and papers on DFA, *see* Defendant's L.R. 18 at ¶ 26, and that he has become a "recognized expert" in this field as a result of his own research and publications. *Id.* at ¶ 27.

Poli specifies the following conduct by plaintiff or its principals as the basis for his allegations of unfair competition:

1) An April 26, 1983 memorandum Boothroyd wrote and "improperly" placed in the file of a student applicant to the graduate department of mechanical engineering at the University of Massachusetts/Amherst. Defendant's Opp.L.R. 18 at ¶ 7; Defendant's Exhibit 10. This document describes Poli's interactions with the applicant, in essence blaming him for the student's decision to go elsewhere and making it clear that Boothroyd is eager to work with the student if he can convince him to change his mind. Boothroyd states that no copies of this memorandum were ever distributed by him and that the memo was removed by another professor the following day. *Id.* at 3 (copy of 4/27/83 memorandum from the department head to Boothroyd explaining why he was remov-

ing the Boothroyd memo, with notation indicating that a copy has been sent to Poli).

2) Two letters to DEC, one from Boothroyd dated 10/24/84 and another from Hart dated 8/16/85, in which Poli's unauthorized and allegedly infringing use of plaintiff's DFA Software and Handbook is discussed. Defendant's Exhibits 12 and 13. Hart's letter presses Boothroyd's and Dewhurst's request that DEC add a notice to the "Poli" spreadsheet "acknowledging that it is based upon materials copyrighted by [B & D, Inc.]." He also asserts not only that Poli has never collaborated with Boothroyd on DFA projects but also that Poli's "initial and only exposure" to the BDI Software was through his consulting work with DEC. Defendant's Exhibit 13.

3) A letter from Boothroyd to Professor John I. Dixon ("Dixon") of the University of Massachusetts Engineering Department, dated 6/19/86. Defendant's Exhibit 14. In this letter, Boothroyd once again asserts that Poli has "contributed nothing to the development of the [DFA] technique." He also criticizes Dixon for not properly crediting Dewhurst and refers to their previous formal objections to Poli's activities as well as to Poli's promise to withdraw the 1983 spreadsheet. He concludes by noting that these "activities" ultimately led Boothroyd and Dewhurst to leave U. Mass. and stating that he feels "very saddened" to see these activities escalate.

4) A December 10, 1986 letter from Boothroyd to Professor Alberto Rovetta ("Rovetta"), an engineering professor at the Politecnico di Milano. Defendant's Exhibit 15. Boothroyd expresses his reluctance at sharing his research with Rovetta in light of the fact that Poli has been collaborating with one of Rovetta's colleagues and using the results of Boothroyd's research "without giving adequate reference." *Id.*

5) A two-page December 6, 1989 news release issued by plaintiff, sent from Rhode Island to editors around the country, which summarizes the counts and allegations contained in this lawsuit. Defendant's Exhibit 16; Plaintiff's L.R. 18 at ¶ 7. Approximately 10% of these editors were

located in the Commonwealth of Massachusetts. Boothroyd Declaration at ¶ 7. BDI obtained the advice of counsel before authorizing issuance of this release. Plaintiff's L.R. 18 at ¶ 7.

6) A January 1990 newsletter sent by BDI from Rhode Island to "its readers in the manufacturing engineering community." Defendant's Exhibit 17 at 6. The last page of this newsletter contains an announcement regarding BDI's decision to file suit that is substantially similar in tone and content to the December 1989 press release. *Id.*

Plaintiff asserts that Massachusetts addresses constitute less than one-half of one percent of its mailing list and that it obtained the advice of counsel before distributing this newsletter. Plaintiff's L.R. 18 at ¶ 8, citing Boothroyd Declaration at ¶ 8. With respect to the letters sent to Professors Dixon and Rovetta, plaintiff points out that neither BDI nor its predecessor has ever sold any products or services to the recipients of these two letters. *Id.* at ¶ 9, citing Boothroyd Decl. at ¶ 10. Moreover, the letter to Rovetta was written in and sent from Rhode Island in response to a letter from Rovetta that was received in Rhode Island. *Id.* at ¶ 10, citing Boothroyd Decl. at ¶ 11.

Defendant has asserted a need for additional discovery to oppose summary judgment on his counterclaims, as permitted by Fed.R.Civ.P. 56(f). Defendant may not utilize the Rule 56(f) "escape hatch," for two reasons. First, he has not satisfied the requirements of the Rule as elucidated in *Paterson–Leitch v. Massachusetts Electric*, 840 F.2d 985, 988 (1st Cir.1988). With one exception, defendant's request for additional discovery is based merely on general speculation that further documents might be found evidencing improprieties committed by the plaintiff. This is not enough. The one specified item of discovery—the computer print-out of mailing lists used to distribute the 1990 newsletter—would not generate a *material* issue of fact. That is to say, even if the mailing list demonstrated a much higher percentage of Massachusetts recipients of the newsletter, it would

not affect the court's decision regarding the plaintiff's motion for summary judgment on the defendant's counterclaims.

Second, and equally importantly, defendant had a lengthy period to complete discovery and suspended these efforts by his own choice. The case was filed in Boston on July 28, 1989. After transfer to the Western Section, this magistrate convened a scheduling conference pursuant to Fed. R.Civ.P. 16 and on December 7, 1989 issued an order mandating completion of all discovery by June 15, 1990. *See* Docket No. 20.

On April 3, 1990 both counsel filed a Motion for Modification of Scheduling Order (Docket No. 25) reviewing in detail the very substantial discovery completed to date and seeking a stay of *expert* discovery pending a ruling on a contemplated motion for summary judgment. Since a ruling on the motion for summary judgment would not turn on any expert opinion in this case, the court allowed the Motion for Modification and set a date for argument on the motion for summary judgment.

A further Request for Revision of the Scheduling Order (Docket No. 26) was filed on May 25, 1990, seeking a stay of the partially-completed depositions of the principals. The motion clearly suggested that the remaining subject matter to be covered in these depositions would not be germane to the motions for summary judgment. To make the matter crystal clear, the court stated in its ruling on the Request for Revision:

> ALLOWED, on the assumption that the indefinite extension of time to complete the depositions of the principals will not interfere with the court's ability to rule on any motion for summary judgment.

Order of 5/31/90 (Docket No. 26).

The court would never have allowed either of the motions to stay discovery to permit rulings on motions for summary judgment, if the very motions were going to be opposed on the ground that inadequate discovery had been permitted.

Defendant had over eight months to complete discovery and suspended it by his own choice, not the court's. He has not pointed

to any further, specific discovery that could generate a genuine, material dispute of fact. The court must make its recommendation on the factual record now before it.

## III. DISCUSSION.

A. *Defendant's Motion for Summary Judgment on Count I: Plaintiff's Copyright Claim.*

Defendant offers several theories in support of his contention that he is entitled to summary judgment on Count I as a matter of law. None is persuasive given the record in its present state. The court will deal with each *seriatim.*

### 1. Defendant is Not an Infringer.

Plaintiff claims that the 1983 "Poli" spreadsheet constitutes the first of a series of unauthorized derivative works based—at least in part—on the copyrighted DFA Software and Handbook. Defendant acknowledges that under § 106 of the Copyright Act, a copyright owner has the exclusive right to authorize not only the reproduction of copyrighted work, but also the preparation of *derivative* material based upon that work.[7] Similarly, defendant does not contest the general copyrightability of spreadsheets, including their arrangement.[8]

Poli's first contention is that—notwithstanding his confessed "adaptation" of plaintiff's DFA Software to create his 1983 spreadsheet—and the clear evidence of record that, if accepted, would support a finding of infringement—he cannot be an infringer because he "is not a party" to the sale of the "Poli" spreadsheet and its companion software package. These, he says, were sold *only* by the University of Massachusetts. *See* Defendant's Memorandum in Support of Summary Judgment (hereafter Defendant's Memo.) at 7.

This line of argument simply flies in the face of the facts of record. Poli does not contest that he copyrighted the 1983 spreadsheet in his own name, that he failed to indicate on the registration form the previous work by plaintiff's predecessor upon which his own spreadsheet was admittedly based, and that he was able to draw upon the University account funded by the proceeds from the sales of these derivative materials to pay his research expenses and summer research salary.

Moreover, plaintiff asserts that Poli continued to produce a more or less steady stream of illegal derivative works based, at least in part, upon the infringing 1983 spreadsheet and software, including professional papers, articles, and videotape lectures, some of which he benefitted from *directly* via royalties and all of which falsely credited him as the author of this methodology. Finally the court notes that § 501(a) defines an infringer as "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by Sections 106 through 118 ..." Profit is not an element of infringement.

### 2. Statute of Limitations.

Citing 17 U.S.C. § 507(b), defendant next asserts that this claim is barred by the Copyright Act's three-year statute of limitations. He contends he is entitled to summary judgment because any activity of his which might have constituted infringement took place—if at all—in 1985 or earlier. *See* Defendant's Mem. at 7–8.

Section 507(b) states that "no civil action shall be maintained under the provisions of this Title unless it is commenced within three years after the claim accrued." While defendant's line of reasoning has some superficial appeal, given the fact that

---

**7.** Section 106 reads in pertinent part:
   Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
   (1) to reproduce the copyrighted work in copies or phonorecords;
   (2) to prepare derivative works based upon the copyrighted work.

**8.** The leading case on this issue in the First Circuit is *Lotus Development Corporation v. Paperback Software International,* 740 F.Supp. 37 (D.Mass.1990). In his closely reasoned opinion, Judge Keeton rehearses the legislative history of the Act and applies it to computer technology. The invention and copyrightability of electronic spreadsheets are discussed in detail at 740 F.Supp. at 65–66 and 77–79, respectively.

this suit was not filed until July 1989, it must fail. Plaintiff has identified several post–1985 derivative works, many if not all of which allegedly incorporate the 1983 "Poli" spreadsheet and/or elements of plaintiff's copyrighted DFA Software and Handbook. Because these works fall well within the statute's three-year limitations period, plaintiff has met its burden of coming forward with facts of record from which a reasonable factfinder could infer that Poli's accused works began infringing on plaintiff's copyright in 1983 and have continued to do so until the filing of this suit.

The court finds the defendant is not entitled to summary judgment on the basis of § 507(b).

### 3. Lack of Standing.

Defendant's next argument is also unpersuasive. Poli relies on 17 U.S.C. §§ 204(a) and 501(b) for the proposition that plaintiff lacks standing to sue him for copyright infringement. According to defendant, BDI has not produced any contemporaneous documents indicating that it became the owner of the copyrights at issue here in 1985 or at any time prior to the commencement of this lawsuit. *See* Defendant's Mem. at 8–9.

Plaintiff's response is two-fold. First, it points to Exhibit 45, the documents executed by its principals as shareholders of its predecessor corporation in August of 1985, as evidence of the transfer of ownership at that time. Second, plaintiff directs the court's attention to Exhibit 46, the Confirmatory Assignment of February 5, 1990 which ratifies the 1985 transfer of title and records it.

Section 204(a), which defendant cites but does not quote in his memorandum, provides in pertinent part that:

> "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or *a note or memorandum of the transfer,* is in writing and signed by the owner of the rights conveyed ..."

(Emphasis added.) On their face, the 1985 documents appear to satisfy the literal terms of § 204(a) by memorializing the transfer of B & D, Inc.'s assets to BDI.

Moreover, while neither party has cited a single case in support of its position, the court notes that the Second Circuit has stated that the purpose of this subsection is to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses. In *Eden Toys, Inc. v. Florelee Undergarment Company, Inc.,* 697 F.2d 27, 36 (2nd Cir.1982), the court held not only that the requirement could be satisfied by a "later execution in writing which confirms the agreement" but also that it would be "anomalous" to invoke this provision in situations not involving mistaken or fraudulent licenses. *Id.* The same rationale applies here: Section 204(a) should not be invoked as a shield by an infringer who has repeatedly and unambiguously been put on notice by the copyright owners that his continuing use of their copyrighted material is unauthorized by them.

Finally, "[a] determination of ownership is a conclusion of law based on underlying facts." *Motta v. Samuel Weiser, Inc.,* 768 F.2d 481, 484 (1st Cir.1985), *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 575 (1985), citing 3 Nimmer, § 13.01[A.]. Although BDI is not the author of the copyrighted works, Boothroyd and Dewhurst are. This court therefore finds as a matter of law that BDI has pointed to sufficient links in the chain of title to "establish a proprietary right" such that it has standing to bring this copyright claim. *Id.* (Citation omitted.)

### 4. Recordation Requirement.

Section 205(d) of the Copyright Act provides that

> ... no person claiming by virtue of a transfer to be the owner of copyright or of any exclusive right under a copyright is entitled to institute an infringement action under this Title until the instrument of transfer under which this person claims has been recorded in the Copyright Office, but suit may be instituted after such recordation on a cause of action that arose before recording.

While plaintiff here concedes its failure to so record prior to institution of this action, it correctly notes that district courts in several jurisdictions have held that an infringement action need not be dismissed because the assignment was not recorded prior to the commencement of suit.

In *Northern Songs, Ltd. v. Distinguished Productions Inc.*, 581 F.Supp. 638, 640 (S.D.N.Y.1984), the court emphasized that all the subsections of § 205 served "to provide record notice of a transfer before the bringing of a suit." The *Northern* court went on to observe that, "while recordation of an exclusive copyright transfer is a jurisdictional prerequisite to maintenance of a copyright infringement action, courts have consistently permitted a plaintiff to correct a defective recordation, and to go forward with the suit as of the date of the filing of the action." *Id.* at 641. Dismissal on this ground is warranted only if a defendant can demonstrate other factors, such as prejudice. *Id.* .

Citing *Northern* with approval, Judge Caffrey held in *Quincy Cablesystems, Inc. v. Sully's Bar*, 650 F.Supp. 838, 850–51 (D.Mass.1986), that plaintiff was entitled to cure its complaint by complying with § 205(d) via back-recordation and filing of an amended complaint. Judge Caffrey stressed that the absence of any showing "that correction of the defect ... would prejudice defendants ..." was determinative. Subsequent recordation was also held to cure this jurisdictional defect and relate back to the date of filing in *Hulex Music v. Santy*, 698 F.Supp. 1024, 1027–28 (D.N.H. 1988), citing *Co-Opportunities, Inc. v. NBC*, 510 F.Supp. 43, 48–49 (N.D.Cal.1981), and *Wales Indus. Inc. v. Hasbro Bradley, Inc.*, 612 F.Supp. 510, 514–15 (S.D.N.Y. 1985).

This court concludes as a matter of law that plaintiff's recordation of the instrument of transfer with the Copyright Office effective as of February 20, 1990, when coupled with defendant's inability to come forward with evidence of prejudice, constitutes a cure of plaintiff's violation of § 205(d) and relates back to the time of filing.

5. Laches and Estoppel.

Defendant's final effort to achieve summary judgment with respect to plaintiff's copyright claim turns on the delay between the time Boothroyd and Dewhurst first complained about Poli's activities in 1984–1985 and July 1989, the date upon which this suit was filed. Relying on *New Era Publications International v. Henry Holt & Co.*, 873 F.2d 576, 584–5 (2nd Cir.1989), *reh. den. en banc*, 884 F.2d 659 (2nd Cir. 1989) and *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990), Poli attempts to characterize BDI's conduct as inexcusable and sufficiently prejudicial to bar the instant suit under the theories of laches and estoppel. In essence, defendant alleges that this delay severely prejudiced him because it led him to rely on plaintiff's silence and to assume that from August 16, 1985 (the date of Hart's last correspondence with Dempsey) on, Boothroyd and Dewhurst were satisfied that revisions Poli had made to the earlier spreadsheet and software no longer constituted infringements of their copyrights. *See* Defendant's Memo at 14–15.

*New Era* is legally and factually inapposite. *New Era* involves the successful assertion of laches as a defense to a motion to enjoin publication of a book already printed and packaged for distribution. The Second Circuit found that plaintiff had delayed "unreasonabl[y] and inexcusabl[y]" in filing suit and that defendant had successfully demonstrated that granting such relief would "severely" prejudice it. *Id.* at 584–585.

For its part, plaintiff points both to facts of record and to caselaw supporting its position that the delay in instituting suit here was both reasonable and non-prejudicial to defendant. To begin with, the 1984–85 correspondence which culminated in Hart's final letter unambiguously informed Poli that Boothroyd and Dewhurst considered his revised software to be yet *another* infringing derivative work. Moreover, the August 1985 letter expressly put Poli on notice that Boothroyd and Dewhurst had performed an extended analy-

sis of the works, would continue to monitor his actions, and reserved their right to seek legal relief. Viewing these facts in the light most favorable to plaintiff, no reasonable factfinder could infer that Boothroyd and Dewhurst demonstrated satisfaction with defendant's response to their repeated complaints about infringement, or that Poli acted reasonably in relying upon their subsequent lack of correspondence.

Cases applying the principles of estoppel and laches in the copyright context lend additional support to BDI's position. In *Hoste v. Radio Corporation of America*, 654 F.2d 11, 12 (6th Cir.1981), the Appeals Court reversed a grant for summary judgment in favor of a defendant because that defendant had failed to come forward with evidence of prejudice to it "by reason of plaintiff's delay in filing [the] action" and because plaintiff raised material issues of fact as to whether the delay was reasonable. Similarly, the Federal Circuit Court of Appeals recently reversed a grant of summary judgment based on laches in a patent infringement case, holding that defendant had failed to point to undisputed facts showing that delays of less than six years by plaintiff were unreasonable or prejudicial to defendant. *Meyers v. Brooks Shoe, Inc. and Wolverine World Wide, Inc.*, 912 F.2d 1459, 1461–63 (Fed.Cir.1990). *See Lotus Dev. Corp. v. Paperback Software International*, 740 F.Supp. 37, 82 (D.Mass.1990) (14½ month delay in filing suit held not unreasonable or prejudicial to defendant, even where defendant continued to develop and market infringing software during this period and even where plaintiff failed to notify defendant that it considered defendant's software objectionable and planned to enforce its proprietary right, because plaintiff used the time to conduct an inquiry into the facts).

With respect to estoppel, cases applying that principle in the context of copyright actions indicate that Poli must be able to establish four elements to offer this defense: "1) [t]he party to be estopped [BDI] must know the facts; 2) [BDI] must intend that [its] conduct [i.e., failure to protest after 1985] shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; 3) [Poli] must be ignorant of the true facts; and 4) he must rely on [BDI's] conduct to his injury." *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960) and *cert. denied* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960); *Hearst Corporation v. Stark*, 639 F.Supp. 970, 980 n. 14 (N.D.Cal.1986). *See also*, Judge Keeton's recent rejection of a defendant's estoppel argument in a copyright infringement action involving software, *Lotus*, 740 F.Supp. at 82–83. Here, at best, the undisputed facts support only *Hampton*'s first element; the final three are disputed or manifestly favor the plaintiff.

In sum, taking the facts in the light most favorable to the non-moving party, here the plaintiff, the court finds that defendant is not entitled to summary judgment on the plaintiff's copyright claim.

**B.** *Defendant's Motion for Summary Judgment with Respect to Count II: Plaintiff's Lanham Act Claim.*

The version of the Lanham act operative during all times relevant to this suit reads as follows:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). Invoking this provision, plaintiff relies on the same facts underlying its copyright claim to argue that Poli violated the Lanham Act's ban on false designations of origin.

Specifically, BDI asserts that when Poli copied aspects of its copyrighted DFA Software and Handbook to create his 1983 spreadsheet, his "electronic spreadsheet," and subsequent infringing derivative works, he falsely designated the origin of these works by placing his own name on the copyright notice. In effect, by marketing this material Poli sought to pass off the work of Boothroyd and Dewhurst as his own, thus committing what is technically known as "reverse palming off." [9]

Defendant replies that he is entitled to summary judgment on Count II as a matter of law because the First Circuit has narrowly interpreted the Lanham Act to apply only to "the misuse of *trademarks*, i.e., the passing off of one's own goods as those of a competitor." *Samson Crane Company v. Union Nat. Sales*, 87 F.Supp. 218, 222 (D.Mass.1949), *aff'd per curiam*, 180 F.2d 896 (1st Cir.1950). (Emphasis supplied.) Reviewing the Act as a whole, the *Samson* court concluded that the Act could reach "other forms of misrepresentation which are of the same general character even though they do not involve any use of what can technically be called a trademark." *Id.* However, the court construed § 43(a) to include "only such false descriptions as are of substantially the same economic nature as those which involve infringement or other improper use of *trademarks.*" *Id.* (Emphasis added.)

Perhaps most damaging to plaintiff's claim here is the *Samson* court's pronouncement that the Act "should not be interpreted so as to bring within its scope any kind of undesirable business practice which involves deception ... especially when such undesirable practices are already the subject of other Congressional legislation ..." *Id.* The facts here do not support a Lanham Act claim of the narrow species recognized by the First Circuit.

In subsequent years, the First Circuit has noted that other circuits have adopted "more liberal views of the statute, some indicating that it in essence creates a private right of action for ordinary 'false advertising.'" *Clamp-All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 491 (1st Cir.1988), *cert. den.* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989). Yet this Circuit "refused to reconsider the validity of *Samson Crane*" as recently as 1988. *Id.*[10]

This court is aware of then District Judge Selya's criticism of *Samson Crane*, in 1983, but considers *Samson Crane* still binding. *See Schroeder v. Lotito*, 577 F.Supp. 708, 720–21 (D.R.I.1983). Moreover, *Lotito*—which involved improper use of an inexact copy of a union's trade symbols—is factually inapposite to the case at bar.

Conceding that *Samson Crane* has never been overruled, plaintiff here attempts to escape its reach by citing *Smith v. Montoro*, 648 F.2d 602 (9th Cir.1981), and by characterizing defendant's conduct as "reverse palming off." While *Montoro* contains a lucid discussion of the elements of a

---

**9.** The direct variety of "palming off" occurs when a party manufactures something himself and attempts to label it as *another's*—e.g., imprinting "Rolex" on a watch assembled in one's basement and selling it on the street corner.

**10.** Compare *Quabaug Rubber Company v. Fabiano Shoe Company, Inc.*, 567 F.2d 154, 161 (1st Cir.1977), in which the First Circuit upheld an award of injunctive relief for "palming off" under the Lanham Act where there was "ample evidence that [plaintiff's] customers were 'confused and fooled' by [defendant's] conduct" in using a colored label on its products similar to one used on—and associated by the public with—plaintiff's products. This court has locat-

ed only one District of Massachusetts case which bears a closer factual resemblance to the case at bar. In *Brandon v. Regents of the University of California*, 441 F.Supp. 1086 (D.Mass. 1977), Judge Caffrey ruled in favor of plaintiff on her Lanham Act claim under § 1125(a) where the evidence adduced at trial established that defendant's production and distribution of a film with a "plagiaristic title" and contents constituted unfair competition, false description, and false representation under the Act. However, the *Brandon* court stressed that plaintiff had not filed a copyright claim against defendant. *Id.* at 1090. *Brandon* is thus distinguishable from the case at bar.

43(a) claim, it does not have precedential authority in this circuit.[11] Even were this not the case, *Montoro* is distinguishable from the case at bar both on its facts and in its application of the law.[12]

In sum, plaintiff here cannot make out the elements of a claim under 43(a), as it has been construed by this circuit. Defendant is therefore entitled to summary judgment with respect to plaintiff's claim under the Lanham Act.

### C. Defendant's Motion for Summary Judgment with Respect to Counts III and IV.

Defendant has filed this motion for summary judgment as one encompassing "all claims" made by plaintiff. *See* Defendant's Motion for Summary Judgment at 1. However, he utterly fails to address the state statutory and common law counts for unfair competition. Instead, he merely asserts in conclusory terms that these counts must fail because they are "based upon the copyright and Lanham Act claims." *Id.* at 3. Rule 56 places a greater burden on a moving party than this.

In the absence of any factual or legal argument with respect to Counts III and IV, the court finds as a matter of law that summary judgment should be denied.

### D. Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims for Statutory and Common Law Unfair Competition.

Defendant contends that beginning in about 1983, plaintiff's principals adopted a deliberate course of conduct intended to discredit him by making false and misleading accusations and misrepresentations concerning him and his work in the field of Design for Manufacturability to others in the academic and business communities. *See* Defendant's Memorandum in Opposition to Summary Judgment ("Defendant's Opposition") at 5–6. Defendant points to seven documents, summarized above, as the basis for his two counter-claims: 1) the April 26, 1983 memorandum; 2) the two letters to DEC dated 1984 and 1985; 3) the June 1986 letter to Dixon; 4) the December 10, 1986 letter to Rovetta; 5) the December 6, 1989 BDI press release; and 6) the January 1990 BDI newsletter. Plaintiff's Memorandum in Support of Summary Judgment at 5, citing Plaintiff's Exhibit 7 (Defendant's Answer to Interrogatory No. 4). Defendant also maintains that, as a result of this course of conduct, he lost the opportunity to have his DFA methodology incorporated into Sapphire's new computer product and was removed from consideration as a contributing author to a new textbook in the field.

Defendant opposes summary judgment with respect to both counts on the ground that "there are significant issues of material fact which surround each of the acts relied on by [him] in support of his counterclaims." Defendant's Opposition at 6. As will be seen, the nature of these surrounding facts—other than a lengthy history of mutual antagonism—is not clear. Accordingly, the court must determine whether—viewing the acts of the plaintiff, largely as embodied in the documents, in the light most favorable to Poli and drawing all reasonable inferences in his favor—the plaintiff's alleged conduct provides an adequate basis as a matter of law for a claim under

**11.** Second Circuit Lanham Act caselaw is significantly more generous than the authorities in this circuit. *See, e.g., Goldsmith v. Main Line Book Co.*, 14 U.S.P.Q.2d 1459, 1989 WL 111115 (S.D.N.Y.1989), relied upon by plaintiff here.

**12.** In *Montoro,* the defendant film distributors had not only removed plaintiff's name from both the film credits and the advertising for the film in which he had acted, but also had substituted a name of their own choosing. In reversing the District Court's dismissal of plaintiff's Lanham Act claim for false designation of origin, the Ninth Circuit Court of Appeals drew an implicit analogy between names of actors and trademarks, quoting with approval an earlier Ninth Circuit decision emphasizing " '[t]he dispositive question is whether the party has a reasonable interest to be protected against false advertising ...' " 648 F.2d at 605. This is precisely the liberal reading of the Act which the First Circuit rejected in *Samson Crane.* Additionally, plaintiff's attempt here to analogize Poli's use of his name on the copyright notice with the removal of the actor's name from the film credits in *Montoro* is unpersuasive.

either Mass.Gen.Laws ch. 93A or the common law of Massachusetts.[13]

### 1. The Chapter 93A Claim.

Chapter 93A, § 2(a) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Moreover, in order to be actionable under ch. 93A, the conduct complained of "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App.Ct. 498, 504, 396 N.E.2d 149 (1979).

Plaintiff attacks defendant's statutory claim on several fronts. First, BDI correctly notes that by its terms, ch. 93A specifically requires that the alleged misconduct must have occurred in "trade or commerce." Plaintiff also cites *Manning v. Zuckerman*, 388 Mass. 8, 10, 444 N.E.2d 1262 (1983), for the proposition that the statute "was intended to refer to individuals acting in a business context in their dealings with other business persons and not to every commercial transaction whatsoever." See also *Planned Parenthood Fed. of American Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 490–92, 498 N.E.2d 1044 (1986).

Second, BDI notes that the applicable statute of limitations is four years. *See* Mass.Gen.Laws ch. 260, § 5A. Thus, any activities by plaintiff's principals which occurred prior to July, 1985 cannot serve as the basis for Poli's 93A claim.[14]

Finally, ch. 93A, § 11 provides in part that:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the deceptive act or practice occurred *primarily and substantially* within the Commonwealth.

(Emphasis added.)

Regarding the non-commercial nature of much of the conduct at issue here, defen-

dant has identified only one chapter 93A case arising in an academic context, *Gerli v. G.K. Hall & Company*, 851 F.2d 452 (1st Cir.1988). However, defendant's reliance on *Gerli* is misplaced, since the challenged conduct in that case—albeit involving academic authors—was breach of a book contract by their publisher. Such allegations do not bear even a remote resemblance to the allegations of academic infighting and jockeying for reputation and credit that are at issue in this counterclaim. A good deal of the behavior Poli complains of simply did not occur "in the conduct of any trade or commerce." For example, the 1983 memo to the student file and the letters to Dixon and to Rovetta are not actionable under ch. 93A.

At the very most, then, drawing every reasonable inference in defendant's favor, of the seven documents specified, only the Boothroyd letter to DEC of 1984, the Hart letter of 1985, the December 1989 BDI press release and the January 1990 BDI newsletter could arguably satisfy the "commercial" criterion of 93A. Yet, as plaintiff correctly points out, Judge McNaught rejected a similar 93A claim based upon notices regarding pending patent infringement suits in *Abcor, Inc. v. Romicon, Inc.*, 212 U.S.P.Q. 679, 680 (D.Mass.1980). This persuasive opinion eliminates any doubt concerning the viability of a statutory unfair competition claim based upon the 1989 and 1990 documents.

With respect to plaintiff's statute of limitations defense, defendant urges this court to adopt the theory of a "continuing tort" to extend liability under 93A and the common law. *See* Defendant's Opposition at 18. However, Poli concedes that Massachusetts courts have been reluctant to extend this doctrine beyond the nuisance and trespass context, citing *Flotech, Inc. v. E.I. Du Pont de Nemours Co.*, 627 F.Supp. 358, 363 (D.Mass.1985), *aff'd* 814 F.2d 775 (1st Cir.1987). Because this court is "in the business of applying"—"not changing"—

---

**13.** For the reasons noted above, defendant's Rule 56(f) claim for further discovery is unavailing.

**14.** Both parties agree that the applicable statutes of limitations for 93A and the common law count are four years and three years, respectively. *See* Defendant's Opposition at 17 n. 16.

the laws of its forum state, *Demars v. General Dynamics Corp.*, 779 F.2d 95, 101 (1st Cir.1985), it must decline defendant's invitation to adopt the continuing tort doctrine in this context. This drives a second arrow through the claims based on the 1983 memorandum and eliminates the Boothroyd letter of 10/24/84.

Equally damaging to defendant's position is the statutory prerequisite that the challenged acts must have occurred "primarily and substantially" in Massachusetts. Poli attempts to circumvent this requirement by citing the "functional" approach discussed by the SJC in *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985). In endorsing this approach, however, the *Bushkin* court indicated that a plaintiff must be able to point to defendant's "significant contacts in" and *"primary* involvement with" the Commonwealth. *Id.* at 638–639. (Emphasis added.) Even under this functional approach, Poli's opposition to summary judgment is untenable in light of Boothroyd's unopposed declaration that both the 1989 press release and the 1990 newsletter were issued from Rhode Island. In other words, even without the *Abcor* decision, these two documents could not form the basis for a claim under ch. 93A.

After combing out non-commercial and time-barred claims, as well as those which arise primarily outside this Commonwealth, the court is left with the 1985 Hart letter to DEC. As noted, ch. 93A reaches only conduct that would "raise the eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings,* 8 Mass. App.Ct. at 504, 396 N.E.2d 149. By no stretch of the statute could a letter from an attorney protesting misuse of his client's property be so construed. To hold to the contrary would make this already expansive statute utterly shapeless. In fact, applying *Levings,* it is difficult to discern how, even taken together, the defendant's allegations—forgetting their other deficiencies—can satisfy 93A's "rascality" standard.

It must be borne in mind that the allegations of the plaintiff here in its complaint are of an entirely different order from those raised in defendant's counterclaim. Defendant charges no misappropriation of copyrighted material, for example. The conduct complained of by defendant amounts to little more than an ongoing, often bitter professional rivalry between academics in the same field. The actions offered to form the basis of the counterclaim do not rise to the level of a 93A claim.

## 2. Defendant's Counterclaim for Common Law Unfair Competition.

Defendant has not offered any additional legal or factual argument in opposition to plaintiff's motion for summary judgment with respect to the counterclaim for common law unfair competition. For its part, plaintiff contends that the specified documents do not constitute the tort of unfair competition under Massachusetts law. This court agrees.

Citing *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 489 N.E.2d 185 (1986) and *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 162 (1st Cir.1977), plaintiff asserts that Poli has offered no evidence from which a reasonable factfinder could infer that BDI did anything within the three-year limitation period, other than try to: 1) disassociate the authorship of its intellectual property from Poli; 2) resolve its problems with him without resorting to litigation; and 3) inform its potential customers of the allegations made in the pending litigation.

As the First Circuit stated in *Quabaug Rubber,* 567 F.2d at 162, the "essence" of a common law unfair competition claim "is the appropriation of a competitor's business to his injury." Absolutely no evidence of record supports a claim by Poli of this sort. More recently, the SJC emphasized that "likelihood of confusion as to source or origin" of goods or services is an "essential ingredient" of this tort. *Datacomm,* 396 Mass. at 768, 489 N.E.2d 185. *See also, Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804, 807 (1st Cir.1971). Once again, defendant's factual allegations would support no such claims.

Moreover, in Massachusetts a plaintiff must show " 'either "palming off" [of a product or service] *or* that the features of the product ... [or service] have acquired' a secondary meaning such that confusion as to its source is likely to arise if the defendant is allowed to copy them." *Datacomm*, 396 Mass. at 768–769, 489 N.E.2d 185. (Emphasis in original.) (Citations omitted.) *See also Nolan & Sartorio,* 37 Mass.Prac., Torts § 100 at 143. Likelihood of such confusion cannot be remotely inferred from the documents relied upon by the defendant here, or indeed any conduct by the plaintiff. The theory of common law unfair competition does not apply to the facts alleged by defendant in his counterclaim. Plaintiff is therefore entitled to summary judgment on defendant's second counterclaim as a matter of law.

### IV. CONCLUSION.

For the foregoing reasons, this court hereby recommends that the defendant's motion for summary judgment be ALLOWED with respect to Count II, the Lanham Act claim, but that it be DENIED with respect to Counts I, III and IV. The court also recommends that plaintiff's motion for summary judgment be ALLOWED with respect to both of defendant's counterclaims.[15]

---

**15.** The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection thereto with the Clerk of this court *within ten (10) days* of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See U.S. v. Valencia-Copete,* 792 F.2d 4, 6 (1st Cir.1986); *U.S. v. Escoboza Vega,* 678 F.2d 376, 379 (1st Cir.1982). *See also, Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985).